# United States Court of Appeals

## For the First Circuit

No. 05-2114

UNITED STATES OF AMERICA,

Appellee,

v.

CARLOS JACA-NAZARIO,

Defendant, Appellant.

No. 06-2157

UNITED STATES OF AMERICA,

Appellee,

v.

CARLOS JACA-NAZARIO,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]
[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Howard, Circuit Judge,

Selya, Senior Circuit Judge,

and Dyk,* Circuit Judge.

---

*Of the Federal Circuit, sitting by designation.

Maria H. Sandoval for appellant.

Germán A. Rieckehoff, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief Appellate Division, Jacqueline D. Novas, Assistant United States Attorney, and Thomas F. Klumper, Assistant United States Attorney, were on brief, for appellee.

————————————

March 27, 2008

————————————

**HOWARD**, **Circuit Judge**.  Carlos Jaca Nazario ("Jaca") pled guilty to conspiring to transport cocaine in two separate criminal cases.  He was sentenced by a different judge for each plea.  He makes a variety of claims on appeal, some directed at one sentence, some at the other, and some at both.  Because we find that the district court erred in its determination of whether the conduct underlying each case was, in the parlance of the federal sentencing guidelines, "relevant conduct" as to the sentencing of the other, we vacate both sentences and remand for resentencing.

Jaca pled guilty in both proceedings; we therefore recite the facts as contained in the presentence reports (PSRs), sentencing memoranda, and transcripts of the sentencing hearings.  See United States v. Marks, 365 F.3d 101, 101 (1st Cir. 2004).  We reserve discussion of some facts relevant to particular arguments.

Jaca was a taxi driver who had connections among the workers at Marin airport in San Juan, Puerto Rico.  He would take bags filled with cocaine and through this network of accomplices ensure that they were put on airplanes bound for the mainland United States.  This operation came under scrutiny by two separate investigations at around the same time.

From February to July, 2003, Jaca transported what he believed to be cocaine for a woman named Vanessa.  Vanessa was cooperating with authorities; the cocaine was a dummy.  Jaca and his crew placed twenty kilos of this sham cocaine on a flight in

-3-

February, 2003.  Federal agents in charge of the investigation contrived to have that shipment "lost," enabling some hardball tactics by Vanessa, about which we will say more later.  A "successful" shipment of another twenty kilos followed in March, 2003.  In July, Jaca twice handled more "cocaine" for Vanessa; both attempts failed only because an accomplice did not load the sham cocaine on the airplane.  For the sake of clarity, we refer to these activities collectively as "the sham cocaine smuggling."

The day after the last attempt to ship cocaine for Vanessa, Jaca and his crew placed thirty kilos of real cocaine on an airplane bound for New York as part of a conspiracy to move a large quantity of cocaine through Puerto Rico to the mainland. Neither Vanessa nor the government were involved.  We will refer to this conduct as "the real cocaine smuggling."

An indictment for the real cocaine smuggling issued in September, 2003; it charged some of the other conspirators with moving as much as 153 kilos of cocaine.  The indictment for the sham cocaine smuggling issued in March, 2004.

Different district court judges presided over the two cases.  Jaca moved to consolidate the cases, but the motion was denied; he was the only defendant common to both.  After refusing a plea deal of eleven years for both cases, Jaca eventually made straight guilty pleas.  He moved, again unsuccessfully, to consolidate the two sentencing hearings.

Jaca entered a guilty plea for his role in the sham cocaine smuggling three days before trial was to begin. At sentencing, he was found to have participated in the transport of not less than 50 but not more than 150 kilos of cocaine. With acceptance of responsibility and a "safety valve" reduction in offense level, he was sentenced to 121 months, the bottom of the appropriate guideline sentencing range of 121 to 151 months. In issuing this sentence ("the first sentence"), the district court expressly declined to consider the pending charges in the other indictment.

The indictment for the real cocaine smuggling likewise ended in a guilty plea. The district court declined to consider the sham cocaine smuggling as "relevant conduct" in calculating the total quantity of drugs for sentencing purposes. The court, however, did give Jaca the benefit of the "safety valve" reduction, sentencing him ("the second sentence") to eighty-seven months. The court also exercised its discretion to pronounce a partially concurrent sentence. See U.S.S.G. § 5G1.3. In order to credit Jaca for time already served, the second sentence was deemed to have run concurrently with the first sentence from the date of Jaca's incarceration until the date of the second sentencing -- around eleven months. The remainder of the second sentence was to run consecutively to the first sentence. The second sentence therefore would start, run for around eleven months concurrently

-5-

with the first, and then stop for a little more than nine years, only to start again when the first sentence was finished.

Jaca contends:  (1) that the district court erred by not considering the sham cocaine smuggling to be "relevant conduct" in the second sentence; (2) that because the sham cocaine smuggling was "relevant conduct" in the second sentence, the district court erred in not imposing a fully concurrent sentence as required by U.S.S.G. § 5G1.3(b); (3) that the second sentence constitutes a "suspended sentence" expressly forbidden by 21 U.S.C. § 841(b)(1)(A); (4) that the district court erred in not considering a sentencing entrapment argument, or that, to the extent it did consider the argument, the district court erred in not finding sentencing entrapment; and (5) that the government refused to move for a one-level reduction in bad faith, and therefore the district court should have granted the reduction without the motion.[1]  We will examine these in turn.

### I. Relevant Conduct

On appeal, Jaca maintains that the sham cocaine smuggling was "relevant conduct" to the second sentence, and therefore the second sentence should run entirely concurrent with the first. This argument necessarily has two parts:  first, that the conduct was "relevant" under U.S.S.G. § 1B1.3; and second, that concurrent

---

[1]Because we remand for resentencing we have no need to consider Jaca's additional Due Process argument.

sentencing was mandated under U.S.S.G. § 5G1.3(b).  The first part of this argument has independent force and requires remand for resentencing.  We decline to reach the second question, noting only that the second part of this argument may depend on which version of the Guidelines is used for sentencing.

The threshold question is whether Jaca's conduct in the sham cocaine smuggling was relevant to the second sentence in the required sense.  Since Jaca raised the argument below we review for clear error.  United States v. Joost, 133 F.3d 125, 132 (1st Cir. 1998).

In sentencing Jaca for the real cocaine smuggling, the district court treated the sham cocaine smuggling as "relevant conduct" for some purposes but not for others.  We cannot accept this approach.  The district court granted a dispensation from the mandatory minimum sentence under the "safety valve" provision, U.S.S.G § 5C1.2.  But that provision benefits only defendants who have "not more than 1 criminal history point." U.S.S.G. § 5C1.2(a)(1).  Jaca's prior sentencing in the sham cocaine smuggling would have yielded more than one criminal history point; he could not then be treated as a first offender in the second sentencing. This apparent incongruity is resolved, however, by the PSR for the real cocaine smuggling.  It recommended that Jaca receive the safety valve provision for the second sentence as well as the first, because the sham cocaine smuggling was "conduct that is part

of relevant conduct for this offense." Indeed, the district court could only grant the safety valve a second time if it considered this "relevant conduct" under § 1B1.3.[2] But § 1B1.3 requires that all relevant conduct be taken into account in sentencing, so the drug quantities should have been aggregated.[3] In fact, the government made this argument, unsuccessfully, in its objection to the second PSR, requesting that the amounts be aggregated and the Base Offense Level thereby increased. Because the district court evidently considered the sham cocaine smuggling to be "relevant conduct" for the purposes of granting the second "safety valve," but did not consider it "relevant conduct" for the purposes of calculating offense level, we must vacate Jaca's second sentence.

The parties have also briefed the underlying question of whether the sham cocaine smuggling is indeed "relevant conduct" to

---

[2]Application Note 1 to U.S.S.G. § 5C1.2(a)(1) points to § 4A1.1 for the calculation of criminal history points. That section requires the sentencing judge to add points for "prior sentences." The calculation is mechanical; if the first sentence is a "prior sentence," criminal history points must be added for it. However, Application Note 1 to § 4A1.1 contains a cross-reference to the definition of "prior sentence" in § 4A1.2(a). That definition excludes any "sentence for conduct that is part of the instant offense" and goes on to elaborate, "conduct that is part of the instant offense means conduct that is relevant conduct under the provisions of § 1B1.3 (Relevant Conduct)." U.S.S.G. § 4A1.2. cmt. n.1. None of the other exclusions to the definition come close to applicability in this case. The district court, then, impliedly made a finding of relevance in granting the safety valve.

[3]See United States v. Caraballo, 200 F.3d 20, 25 (1st Cir. 1999) (interpreting U.S.S.G. § 1B1.3 as mandatory language requiring the consideration of all relevant conduct).

the second sentence.  We conclude that the two offenses do relate to the same course of conduct, and therefore vacate both sentences and remand so that each can properly account for this relevant conduct under U.S.S.G. § 1B1.3.

Determining whether the sham cocaine smuggling is "relevant conduct" for the purposes of the second sentence takes us on a hopscotch path through the Guidelines.  Section 1B1.3 of the Guidelines defines "relevant conduct."  Subsection (a)(2) applies to  "offenses . . . for which § 3D1.2(d) would require grouping of multiple counts" and makes relevant conduct "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan."  U.S.S.G. § 1B1.3(a)(2) (2002).  Section 3D1.2(d) includes a list of provisions to which it applies.[4]  Section 2D1.1 of the Guidelines, under which Jaca was sentenced, is included in this list.  The sham cocaine smuggling, then, is relevant conduct if it is part of the same course of conduct or a common scheme or plan.  Closer inspection reveals that Jaca's various crimes are part of the same course of conduct.

For offenses to qualify as the same course of conduct, they must be "sufficiently connected or related . . . to warrant the conclusion that they are part of a single episode, spree, or

_____

[4]Application Note 6 to this Guideline indicates that "conspiracy . . . to commit an offense is covered under subsection (d) if the offense that is the object of the conspiracy . . . is covered under subsection (d)." § 3D1.2, cmt. n.6 (2002).

ongoing series of offenses."  U.S.S.G. § 1B1.3, cmt. n.9(B). Application Note 9 further directs the court to consider "the degree of similarity between the two offenses, the regularity (repetitions) of the offenses, and the time interval between the two offenses.  When one of the above factors is absent, a stronger presence of at least one other factor is required."  Id.  See United States v. Mallett, 496 F.3d 798, 803 (7th Cir. 2007) (upholding district court's finding that possessing the same drug and the same drug paraphernalia on two occasions eight months apart constituted same course of conduct); United States v. Wright, 496 F.3d 371, 380 (5th Cir. 2007) (upholding district court's finding that two similar transactions separated by seventeen days constituted same course of conduct).

Jaca and his crew used the same means to place similar quantities of the same drug on the same airlines out of the same airport.  And the last attempt in the sting occurred the day before the conduct at issue in the second sentence.  While the regularity factor is somewhat attenuated, the strength of the similarity and temporality factors more than compensates.  The district court, therefore, correctly considered the sham cocaine smuggling to be relevant conduct in the second sentence when it granted the "safety valve."  Further, because the test for "same course of conduct" is by its terms symmetrical, the activity in the real cocaine smuggling must have been relevant conduct for the purposes of the

-10-

first sentence.  The contrary finding of the first sentencing court was, thus, clearly erroneous.  We must therefore vacate both sentences and remand for resentencing.[5]

## II. Concurrent or Partially Concurrent Sentencing

Jaca argues that the district court erred in applying U.S.S.G. § 5G1.3(c), which allows discretion in choosing a concurrent, partially concurrent, or consecutive sentence.  He claims that instead U.S.S.G. § 5G1.3(b) mandates a fully concurrent sentence.  Because we remand for resentencing, we consider the argument only long enough to note that this Guideline changed after Jaca committed these crimes but before he was sentenced for them.  See United States v. Lino, 493 F.3d 41, 45 (1st Cir. 2007).  We expect that the Ex Post Facto Clause requires application of the older Guidelines if those would be more lenient.  See U.S.S.G. § 1B1.11(b)(1) ("If the . . . use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."); United States v. Harotunian, 920 F.2d 1040, 1043 (1st Cir. 1990).

---

[5]On appeal, Jaca has confined his relevant conduct argument largely to the second occurring sentence.  However, he has objected to the failure to consolidate the two sentencing proceedings.  We agree that this failure was an abuse of discretion.  Accordingly, we will vacate both sentences and remand both cases for resentencing before a single district judge, who will be in the best position to assess the relevant sentencing considerations.

## III. Suspended Sentence

Although we vacate both sentences, we nonetheless address Jaca's "suspended sentence" argument for what guidance our comments may afford the district court on remand. Convictions such as Jaca's may not result in suspended sentences.[6] Jaca's second sentence itself is not unclear; the sole question is whether it is a suspended sentence. We review questions of statutory interpretation de novo. United States v. Frechette, 456 F.3d 1, 7 (1st Cir. 2006). "By common definition a 'suspended sentence' is a definite sentence postponed so that the defendant is not required to serve his time in prison unless he commits another crime or violates some court-imposed condition during a probationary period." United States v. Gajdik, 292 F.3d 555, 558 (7th Cir. 2002); see also Black's Law Dictionary 1394 (8th ed. 2004) (defining "suspended sentence" as "[a] sentence postponed so that the defendant is not required to serve time unless he or she commits another crime or violates some other court-imposed condition"). Here, the district court allowed Jaca credit against the second sentence for time he had served before the second sentencing. The second sentence was retroactively deemed to have begun at the time the first sentence began, to have been served

---

[6]The relevant language is, "Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph." 21 U.S.C. § 841 (b)(1)(A).

partially concurrently therewith until the date of the second sentencing; the remainder of the second sentence was to be served consecutively to the first sentence. At no time would Jaca be out of custody: The balance of the second sentence would commence automatically when the first sentence ended. This type of sentence, even if unusual, does not constitute a suspended sentence.

## IV. Sentencing Entrapment

Jaca next contends that the district court erred in rejecting the sentencing entrapment argument. Because we find that Jaca was not improperly induced to commit more, or more serious, crimes than those to which he was already predisposed, we agree with the district court that no improper manipulation occurred. The following additional facts provide the basis of Jaca's sentencing entrapment argument.

Investigators working with Vanessa arranged for the first shipment of sham cocaine to be "lost." From this, more urgency was manufactured for subsequent shipments -- Vanessa frequently told Jaca that she would be held responsible for the "lost" shipment. The transcripts of recorded conversations show Vanessa telling Jaca that she feared for her life. Jaca at one point responded that he was losing sleep over the situation. He now argues that this kind of pressure -- that he had to help Vanessa lest she be killed --

overbore his will and caused him to commit additional offenses which then drove up his sentence.

We have used the terms "sentencing entrapment" and "sentencing factor manipulation" interchangeably. United States v. Lora, 129 F. Supp. 2d 77, 89 (D. Mass. 2001) (citing United States v. Woods, 210 F.3d 70, 75 (1st Cir. 2000)) (discussing varying use of the terms among the circuits). In sentencing factor manipulation cases, "the burden of proof is upon the defendant to show that he is entitled to a reduction." United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995) (citation omitted). "The district court's fact findings on this issue, as on other fact questions, are subject to the clearly erroneous standard." Id. Because this is such a fact-bound inquiry, we extend deference even to the district court's conclusion about whether or not the government has behaved outrageously or intolerably. Id. (stating that such a conclusion is "not lightly to be disregarded").

Jaca presses this argument two ways. First, he claims, it was error for the district court to refuse to entertain the sentencing manipulation claim. Second, to the extent that the district court did entertain the claim, it erred in denying relief. Neither avenue leads anywhere.

The record of the relevant sentencing hearing reveals that the district court did consider the argument, but rejected it. Jaca's relies on the statement by the district judge that, "I'm not

-14-

going to determine that in this. I have all the tapes there, and each one interprets the tapes whichever way they think, and I'm not going to get into any issue concerning whether the government has misconduct or not." We are invited to read this comment as a refusal even to entertain the argument. But a little later in the hearing, Jaca's counsel stated, "[I]f you reject our sentencing manipulation argument, and I understand the court has," and the court responded, "I have." Later, the court said to the government, "That was argument concerning the manipulation . . . which I am not accepting." Thus, the district court did consider the argument enough to reject it.

The merits of the sentencing entrapment argument itself are similarly unconvincing. An undercover operation may carry with it a risk that law enforcement will unduly pressure a suspect to commit crimes to which he is not predisposed. But sentencing entrapment does not occur unless "law enforcement agents venture outside the scope of legitimate investigation and engage in extraordinary misconduct that improperly enlarges the scope or scale of the crime." United States v. Barbour, 393 F.3d 82, 86 (1st Cir. 2004). To establish a claim, the defendant must show that "the agents overpowered the free will of the defendant and caused him to commit a more serious offense than he was predisposed to commit." Id. Courts must focus primarily on the behavior and motives of the government. See United States v. Gibbens, 25 F.3d

-15-

28, 31 (1st Cir. 1994) ("When an accusation of sentencing factor manipulation surfaces, the judicial gaze should, in the usual case, focus primarily -- though not necessarily exclusively -- on the government's conduct and motives."). With that focus the sentencing court must determine whether the government has committed "extraordinary misconduct." As a secondary inquiry, the court must consider the predisposition of the defendant to commit the crimes.

Emotional pressure is one possible basis for a finding of entrapment at trial, and therefore presumably also could be an adequate basis in a sentencing entrapment setting as well. In a case relied on by Jaca, United States v. Montanez, 105 F.3d 36, 37 (1st Cir. 1997), we held that a defendant was entitled to a jury instruction that included appeals to sympathy as one kind of improper government inducement to commit a crime. In that case, the government informant was a woman who had lived with the defendant for a time. She later told him that if he did not acquire crack for her to resell, she might lose custody of her children. The pressure from Vanessa on Jaca is similar -- the transcripts of the surveillance tapes show how much she played up fears for her life.[7]

---

[7]Although Vanessa, a confidential informant for the government, certainly knew that the shipments had been intercepted by the authorities rather than "lost," she pressured Jaca, saying, for example, "I'm going to get my head off when those kilos don't appear."

Assuming, arguendo, that Vanessa's conduct is attributable to the government, the government may have strayed from its usual bounds in exerting this degree of emotional pressure on Jaca. This, then, is more than a "garden variety" claim of manipulation. Montoya, 62 F.3d at 4 ("[G]arden variety manipulation claims are largely a waste of time."). But Jaca's reliance on Montanez is nevertheless misplaced. The differing posture of this case demands a different result. Montanez concerned the failure to give the correct instruction to a jury at trial. Here, we review the district court's rejection of a sentencing entrapment argument. The deference we accord the district court precludes a determination that the judge, in effect, failed to give such an instruction *to himself* (or failed to heed it). This finding seems especially supportable since Montanez concerned a defendant with a personal relationship with the person playing on his sympathies. Because Jaca's relationship with Vanessa is apparently a mere business relationship, this kind of pressure will not be as effective.

Sentencing factor manipulation may also rest on a finding of improper government motive. There is no evidence that the government had Jaca make the extra shipments for an improper purpose. It is Jaca's burden to present such evidence, and he has not done so.

When we find the government's behavior troubling, we examine as well the predisposition of the defendant.[8] This inquiry is secondary in part because the defendant has already been found guilty of the crimes, and in the context of sentencing entrapment is only arguing about degree or number of crimes. "Having crossed the reasonably bright line between guilt and innocence, such a defendant's criminal inclination has already been established, and the extent of the crime is more likely to be a matter of opportunity than of scruple." Montoya, 62 F.3d at 4. Evidence in the record indicates that Jaca had engaged many times in similar smuggling transactions.[9] No evidence shows any reluctance on Jaca's part to perform the additional shipments, let alone that the pressure from Vanessa overbore his will.

---

[8]Indeed, a finding that the defendant was predisposed to commit the crimes charged may overcome even a finding of improper motive. See United States v. Fontes, 415 F.3d 174, 181 (1st Cir. 2005) (predisposition to sell crack prevented finding of sentencing factor manipulation even when law enforcement "basically admitted" it demanded crack instead of powder only for a higher sentence).

[9]For example, Jaca indicated to Vanessa he had moved drugs on a particular flight seven times previously. We are mindful that drug smugglers, no less than other businessmen, might exaggerate the scope of their operations to attract new clients. But the representations, even if false, convey predisposition, even eagerness, to commit these crimes. Additionally, the evidence shows a group of men accustomed to working together on transactions of this sort. Jaca says as much in one conversation excerpted in his own brief: "I'm calling them, we've been in communication all the time, also, 'cause of that, 'cause we've been together all the time, you understand me? We're . . . we're a group." (ellipsis in original). The district court was also aware that Jaca was under indictment for moving a shipment larger than any of those at issue here.

-18-

## V. Acceptance of Responsibility

Jaca contends that in the first sentencing the government refused in bad faith to move for the "third level," resulting in only a two-level downward adjustment for acceptance of responsibility. We will set aside such a determination only if it clearly erroneous. United States v. Mateo-Espejo, 426 F.3d 508, 510 (1st Cir. 2005).

The third level is awarded to recognize that the defendant has served justice by "permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1(b). The district court indicated that it could not grant the third level without a motion from the government.[10] Jaca contends that after United States v. Booker, 543 U.S. 220 (2005), this restriction is just as "advisory" as the rest of the Guidelines.[11] Without

_____

[10]Application Note 6 to this Guideline states, "Because the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, and adjustment . . . may only be granted upon a formal motion by the Government." U.S.S.G. § 3E1.1 cmt. n.6.

[11]Other circuits have held that this mandate survives Booker. See United States v. Garcia-Morena, 214 Fed. Appx. 134, 138 (3rd Cir. 2007) (unpublished opinion); United States v. Sloley, 464 F.3d 355, 360 (2d Cir. 2006); United States v. Espinoza-Cano, 456 F.3d 1126, 1135 (9th Cir. 2006) ("[T]he PROTECT Act makes the third level reduction subject to the discretion of the government."); United States v. Smith, 429 F.3d 620, 628 (6th Cir. 2005) ("[E]ven after Booker, a district court consulting the guidelines remains constrained in awarding a § 3E1.1(b) reduction absent a motion by the government."); United States v. Moreno-Trevino, 432 F.3d 1181, 1186 (10th Cir. 2005) (courts have authority to grant the reduction

-19-

deciding that question, we note that the district court also found that the government had not withheld the motion in bad faith. Here, Jaca entered his guilty plea three days before trial was scheduled to begin.  The district court heard from the government that it had indeed prepared for trial.  Although, consistent with its discretion, the district court is free to reconsider this aspect of its sentencing when it entertains this case on remand, we do not believe its determination was clearly erroneous.

Carlos Jaca Nazario's sentences are **vacated**, and the cases are **remanded** for a consolidated resentencing before a single district judge consistent with this opinion.

---

sua sponte only when the government's refusal to move for it is based on an impermissible motive or has no rational basis).