# United States Court of Appeals
## For the First Circuit

No. 12-2451

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT C. KENNEY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

W. Daniel Deane, with whom Nixon Peabody LLP was on brief, for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney and Michael J. Crowley, Assistant United States Attorney, were on brief, for appellee.

June 25, 2014

**HOWARD, <u>Circuit Judge</u>.** After pleading guilty to drug distribution, robbery, and firearm charges, Robert Kenney now seeks withdrawal of his guilty plea. He argues that the district court erred in failing to assess his competency, that it inadequately assessed whether his plea was "knowing" and "voluntary" within the meaning of Fed. R. Crim. P. 11, and that his trial lawyer failed to provide him with effective assistance. Kenney also challenges the district court's imposition of a ten-year mandatory minimum sentence, contending that the district court gave him inadequate notice of the evidence on which it relied and that it incorrectly evaluated his claim of sentencing factor manipulation. Finding no error, we affirm.

## I.

The morning of February 11, 2011 promised to be a busy one for Kenney and his two co-conspirators, Christopher Littlejohn and Ramone Arakelow. Well before dawn, the trio piled into Kenney's truck and drove to a parking lot in Saugus, Massachusetts, where a fourth conspirator awaited them. Posing as law enforcement officers, the four would then break into the apartment of two Brazilian drug dealers, restrain the occupants, and abscond with five kilograms of cocaine and $200,000 in cash. In preparation for the robbery, Kenney had obtained a Boston Police Department patch and police light, along with knives, duct tape, and zip ties to restrain the apartment's denizens. Kenney had also discussed the

-2-

layout of the apartment with Littlejohn and the fourth conspirator, and arranged to break in at a time when only one of the drug dealers was home and when an associate would be present to open the door.

Unfortunately for the would-be robbers, there was no apartment, no cocaine, and no money. Worse still, there was not even a fourth conspirator. Instead, the "co-conspirator" awaiting them in the parking lot was a cooperating witness ("Informant 2"). After Kenney, Littlejohn, and Arakelow entered Informant 2's car and reviewed their plans for the heist, Informant 2 signaled to law enforcement and the three were arrested.

In reality, the planned burglary was a reverse sting operation devised by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), which had been investigating Kenney since the spring of 2010 in connection with the illegal sale of firearms. Between May and December 2010, an ATF informant ("Informant 1") had arranged four firearm purchases with Kenney. When Kenney alluded during one of these sales to a "safe job" he had previously performed, Informant 1 told him about the Brazilian drug dealers' stash-house, which Kenney expressed immediate interest in robbing. Informant 1 continued to weave this fiction in subsequent meetings with Kenney, introducing him to a "business partner" (in reality Informant 2) with whom Kenney planned the robbery.

The robbery scheme may have been quixotic, but its consequences were all too real for the conspirators. On March 16, 2011, a grand jury indicted Kenney, Littlejohn, and Arakelow for conspiracy to possess with intent to distribute at least five kilograms of cocaine, 21 U.S.C. §§ 841(a)(1), 846, and conspiracy to commit robbery affecting interstate commerce, 18 U.S.C. § 1951.[1] Kenney was also charged as a felon in possession of a firearm in four counts arising from his 2010 gun sales.

The primary issues on this appeal first surfaced at Kenney's arraignment in April 2011, when defense counsel informed the Magistrate Judge that Kenney "ha[d] a serious medical condition," that he had undergone brain surgery, and that he was not receiving medical treatment at the facility in which he was being held. The Magistrate Judge replied that she would "address any motion that [she] need[ed] to," but suggested that Kenney's counsel "work with the Government and . . . see if something can be done less formally."

Kenney soon entered into early plea negotiations with the government. In a missive to the Assistant U.S. Attorney, defense counsel indicated that "Mr. Kenny [sic] is suffering from ill

---

[1] Littlejohn pleaded guilty to the robbery conspiracy count in exchange for the government's dismissal of the drug conspiracy charge, and was sentenced to 41 months' imprisonment. Arakelow opted to go to trial, and in March 2012 was convicted of the robbery conspiracy count and acquitted of the drug conspiracy count, receiving a sentence of 120 months' imprisonment.

-4-

health. His condition is deteriorating rapidly. Therefore, it would be in everyone's best interest to come to an agreement sooner rather than later." Toward that end, Kenney moved for the preparation of a pre-plea presentence report ("PSR"), citing "serious health issues" and indicating a desire to plead guilty. The pre-plea PSR, issued in January 2012, stated that Kenney had undergone brain surgery in 2009 to remove a tumor, that he was taking several prescription medications, and that he reported no mental, behavioral, or emotional problems. Kenney's girlfriend did state, however, that he suffered from "some undiagnosed mental health issues because his moods fluctuate[d] and he [could] be temperamental" and that according to Kenney's relatives, "his mood ha[d] changed since the surgery."

Kenney also filed an ex parte motion requesting $10,000 in Criminal Justice Act ("CJA") funds to engage an expert witness to testify about Kenney's mental health as it bore on culpability for sentencing purposes. The motion alluded to Kenney's 2009 brain surgery and further stated: "Based on observations of undersigned counsel, as well as conversations with the Defendant's daughter, it appears as though the Defendant suffers from one or more mental diseases or defects," which had "never been properly diagnosed or treated." It suggested that "several complex factors contributing to [Kenney's] behavior leading up to the charged offenses could only be determined by a forensic psychologist," and therefore that

the proposed expert's testimony "would prove extremely helpful to the Court in determining the appropriate sentence for the Defendant." The district court denied this motion, finding the requested sum "unreasonably high." Kenney filed a second such motion in November 2011, this time seeking $7,000 and attaching a letter from the putative expert deeming it "absolutely indicated to conduct an evaluation of criminal responsibility as decision-making, and/or other mental faculties, may have been affected" by the brain surgery. The district court granted this motion in part, allowing a maximum expenditure of $4,000.

In March 2012, Kenney signed a plea agreement with the government, in which he agreed to provide substantial assistance in the prosecution of Arakelow. In exchange, the government would dismiss the robbery conspiracy charge, recommend a below-Guideline sentence, and move under 18 U.S.C. § 3553(e) for relief from the ten-year mandatory minimum sentence on the drug conspiracy count. At Kenney's change-of-plea hearing on March 15, however, defense counsel informed the court that Kenney wished to withdraw from the plea agreement and plead guilty to all counts without the benefit of the agreement. Kenney made no objection to his lawyer's statement, and the district court proceeded to accept his plea on that basis.

Shortly thereafter, Kenney sent a letter to his attorney claiming to have received threats and suggesting a desire to

withdraw the guilty plea.[2]  On March 22, Kenney's lawyer brought this letter to the court's attention at the final conference before Arakelow's trial.  While admitting that he was "confused by" the letter, defense counsel took it to mean that Kenney "was forced to not take the government deal because of what he [was] being labeled [i.e., a cooperator], and . . . what he [was] having to endure in jail."  The district court responded that if Kenney wished to withdraw his plea, it would allow him to do so and go to trial alongside Arakelow in four days.

The following day, after meeting with Kenney, defense counsel sent a letter to the government and the court stating that Kenney was "adamant" that he did not wish to withdraw his guilty plea.  The letter also shed light on Kenney's sudden repudiation of the plea agreement, explaining that Arakelow had been "tipped off to the fact that Mr. Kenney was cooperating" with the government and had accordingly made "veiled threats" to Kenney and, through recently released inmates, to members of Kenney's family.  Although it was likely too late for Kenney to testify at Arakelow's trial three days later, the letter beseeched the government to honor the plea agreement notwithstanding Kenney's refusal to cooperate.  The government declined to do so, and three days later, Kenney appeared

---

[2]  The letter has apparently been lost, and its exact date is uncertain.  We assume for purposes of this appeal that it was sent "[o]n or about March 21," as Kenney claims.

before the court and confirmed that he did not wish to withdraw his guilty plea.

The case proceeded to sentencing on November 29, 2012.[3] In his sentencing memorandum, Kenney argued inter alia that the district court should disregard as "sentencing factor manipulation" the five kilograms of cocaine ATF added to the conspiracy, which subjected Kenney to a ten-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A). The government sought to rebut this argument by pointing to several recorded conversations involving Kenney that were admitted into evidence at Arakelow's trial. At sentencing, the court agreed with the government's interpretation of the recordings, concluding that "Kenney was the ringleader, the mastermind . . . the recruiter, and an enthusiastic participant in this scheme." The court accordingly rejected Kenney's sentencing factor manipulation argument and imposed the mandatory minimum sentence of 120 months' imprisonment. This appeal followed.

## II.

### A.     Conviction

Kenney contends that his guilty plea must be vacated for three reasons: because the district court 1) failed to evaluate sua

---

[3]  Prior to sentencing, Kenney filed a third motion for CJA funds, seeking an additional $8,000 for a psychological evaluation in aid of sentencing. The district court granted an additional $2,000 in funds (raising the total allotted amount to $6,000), and denied Kenney's motion for reconsideration, stating that it "consider[ed] the amount excessive given the usual charges for examinations of its type."

sponte his competency to plead guilty and 2) inadequately probed whether his plea was "knowing" and "voluntary" as required under Fed. R. Crim. P. 11, and 3) because his trial counsel did not provide the effective assistance guaranteed under the Sixth Amendment. At a minimum, Kenney requests that we remand for an evidentiary hearing on these issues. We address each of Kenney's challenges in turn.

## 1. Competency

Supreme Court precedent has long made clear that "[a] criminal defendant may not be tried unless he is competent, and he may not . . . plead guilty unless he does so 'competently and intelligently.'" Godinez v. Moran, 509 U.S. 389, 396 (1993) (citation omitted) (quoting Johnson v. Zerbst, 304 U.S. 458, 468 (1938)); see also Brady v. United States, 397 U.S. 742, 758 (1970); Pate v. Robinson, 383 U.S. 375, 378 (1966). This requirement "has a modest aim: It seeks to ensure that [the defendant] has the capacity to understand the proceedings and to assist counsel." Godinez, 509 U.S. at 402; see also Dusky v. United States, 362 U.S. 402, 402 (1960). To safeguard this constitutional guarantee, a court must, on either party's motion or sua sponte, order a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings

-9-

against him or to assist properly in his defense."  18 U.S.C. § 4241(a).

Neither Kenney nor the government requested a competency hearing below; instead, Kenney avers that the court, presented with various intimations of Kenney's mental health issues, should have ordered such a hearing on its own initiative.  The government responds that Kenney has waived this argument because he declined to withdraw his allegedly incompetent guilty plea when given the opportunity to do so.  We decline to find this claim waived, however, because the very pith and marrow of Kenney's argument is that he was incapable of understanding the nature and consequences of the proceedings against him, rendering intentional waiver an impossibility.  See Pate, 383 U.S. at 384 ("[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial."); United States v. Hurley, 63 F.3d 1, 18 (1st Cir. 1995) ("For obvious reasons, competency claims are not subject to ordinary waiver doctrine.").  We accordingly review the district court's decision not to hold a competency hearing for abuse of discretion.  United States v. Maryea, 704 F.3d 55, 69 (1st Cir. 2013); United States v. Lebrón, 76 F.3d 29, 32 (1st Cir. 1996).[4]

_____

[4]  The parties disagree as to the proper standard of review. The government avers that "[b]ecause Kenney neither requested a competency hearing nor objected to the district court's failure to

On appeal, Kenney points to several items of evidence that he contends should have alerted the district court to the need for a competency hearing: trial counsel's statement at arraignment that Kenney had undergone brain surgery and was not receiving medical treatment in jail; Kenney's citation of "serious health issues" in his motion for a pre-plea PSR; Kenney's ex parte motions seeking funds to retain a psychologist to assess his mental capacity; the allusion in one of these motions to "mental diseases or defects" that had "never been properly diagnosed or treated"; the putative psychological expert's opinion that it was "absolutely indicated to conduct an evaluation of criminal responsibility as decision-making, and/or other mental faculties, may have been affected" by the 2009 brain surgery; the pre-plea PSR, which chronicled Kenney's history of drug use and noted inter alia that

convene one, this claim is reviewed only for plain error." Although we did review for plain error rather than abuse of discretion in United States v. Giron-Reyes, 234 F.3d 78, 80 (1st Cir. 2000), that case dealt with the failure to hold a competency hearing under a separate statutory provision, 18 U.S.C. § 4241(e), which requires the court to hold a competency hearing after the release of a defendant previously deemed incompetent and hospitalized under 18 U.S.C. § 4241(d). The government cites no cases for the proposition, contrary to Maryea and Lebrón, that plain error review also applies under § 4241(a), and in any event we find abuse of discretion review more appropriate given the inherent contradiction recognized in Pate and Hurley. See United States v. Lindsey, 339 F. App'x 956, 959 & n.4 (11th Cir. 2009) (explaining that plain error review "would unduly cramp review of the district court's obligation to determine for itself whether a criminal defendant is mentally incompetent," and noting "that most of our sister courts apply the abuse of discretion standard of review to a district court's decision about whether to sua sponte order a competency hearing").

Kenney had experienced changes in mood and short-term memory loss since his surgery; and Kenney's last-minute, and at the time unexplained, withdrawal from the plea agreement.

These facts do indeed raise concerns about the general state of Kenney's mental health -- concerns, we might add, that are endemic to the criminal justice system. See generally James & Glaze, Bureau of Justice Statistics Special Report: Mental Health Problems of Prison and Jail Inmates 1 (2006) (reporting that 45% of federal prisoners in 2005 suffered mental health problems). But the question before us is more circumscribed: whether the facts before the district court gave it "reasonable cause to believe" that Kenney's mental illness rendered him "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). As we stated in United States v. Widi, 684 F.3d 216, 221 (1st Cir. 2012), "[a] defendant may have serious mental illness while still being able to understand the proceedings and rationally assist his counsel." The district court was entitled to draw that conclusion here.

The allegedly impugning mental health evidence was either too general (e.g., Kenney's complaint of "serious health issues" and history of drug use) or else focused on issues distinct from Kenney's competency. For instance, nothing in the ex parte motions for funds or the putative expert's letter indicated concern about Kenney's competency; instead, the stated rationale for the proposed

expert evaluation was to "help[] . . . the Court in determining the appropriate sentence for the Defendant" by, in the expert's words, "address[ing] the question of criminal responsibility" (emphases added). Concerns about distinct mental faculties (decision-making and responsibility) at an earlier time (during the commission of the offense) do not necessarily engender reasonable doubts about Kenney's understanding and ability to assist counsel during the criminal proceedings. As for Kenney's eleventh-hour repudiation of the plea agreement, the subsequent revelation of Arakelow's threats demonstrates that while Kenney's withdrawal may have been less than entirely volitional, it was not necessarily indicative of incompetency. The district court was entitled to conclude that Kenney was if anything all too cognizant of the threats that he faced and their possible consequences.

Nor were allusions to Kenney's brain surgery, drug use, and undiagnosed or untreated mental illnesses enough, ipso facto, to necessitate a competency hearing. The defense never voiced any specific concern about Kenney's competency; indeed, on the contrary, Kenney informed the interviewing Probation Officer that he was not experiencing, and never had experienced, any mental, emotional, or behavioral problems. And as we discuss in greater detail in section A.2 infra, Kenney reaffirmed this testimony at his change-of-plea hearing, informing the district court that he had never been treated for mental or psychological problems, that

the brain surgery had slowed his mental processes but did not otherwise impact his comprehension, and that he understood the charges against him, the penalties he faced, and the rights he relinquished by pleading guilty. Such affirmations of competency, even if not conclusive, are entitled to some weight when the defendant is not "plainly incoherent or irrational." Widi, 684 F.3d at 220. We also find it "significant that . . . [Kenney's] attorney, who more than any other courtroom player 'enjoy[ed] a unique vantage for observing whether his client [was] competent,' did not raise any concern about [Kenney's] competency." United States v. Brown, 669 F.3d 10, 17 (1st Cir. 2012) (quoting United States v. Muriel-Cruz, 412 F.3d 9, 13 (1st Cir. 2005)) (internal brackets omitted).[5]

In short, although the district court may have been on notice that Kenney struggled with mental illness generally, we find no abuse of discretion in the district court's failure to sua sponte order a hearing on the specific issue of competency. As we have stated in the past, a holding to the contrary "would 'come close to requiring district courts to order competency hearings sua sponte in every case where a defendant has some history of psychiatric treatment and, even vaguely, mentions the problem.'"

---

[5] That significance is only heightened by the fact that defense counsel did raise concerns about Kenney's mental health in other contexts (e.g., culpability), suggesting that Kenney's lawyer did not simply turn a blind eye to these issues altogether.

Lebrón, 76 F.3d at 33 (quoting Hernández-Hernández v. United States, 904 F.2d 758, 760 (1st Cir. 1990)).  We decline to impose such a requirement and thereby establish the competency hearing as "nearly a routine step between arraignment and trial." Figueroa-Vazquez v. United States, 718 F.2d 511, 512 (1st Cir. 1983).

## 2.  Plea Colloquy

Kenney next avers that his plea colloquy was deficient under Fed. R. Crim. P. 11(b), which requires a court to advise a pleading defendant of his rights and determine that the defendant's guilty plea is knowing and voluntary.  Kenney concedes that plain error review is proper due to his failure to raise this challenge below.  See United States v. Vonn, 535 U.S. 55, 58-59 (2002); United States v. Borrero-Acevedo, 533 F.3d 11, 15 (1st Cir. 2008).[6]

We have explained that Rule 11 addresses three "core concerns": "1) absence of coercion; 2) understanding of the charges; and 3) knowledge of the consequences of the guilty plea." United States v. Cotal-Crespo, 47 F.3d 1, 4 (1st Cir. 1995). Kenney alleges that his plea colloquy was marred by errors implicating each of these concerns, rendering his plea neither

---

[6] Once again, we decline the government's invitation to find this claim waived altogether.  Whether Kenney could be said to have "intentionally relinquishe[d] or abandon[ed]" his Rule 11 claim by refusing the district court's offer of withdrawal, which would have required him to go to trial in four days, presents a closer question than the substantive Rule 11 claim itself.  United States v. Rodríguez-León, 402 F.3d 17, 26 (1st Cir. 2005).  We therefore resolve Kenney's claim on the latter basis.

-15-

knowing nor voluntary.  More specifically, Kenney contends that the district court failed to adequately inquire into 1) the effect of his various medications on his comprehension and 2) the reason for his sudden renunciation of the plea agreement.  We address each argument separately.

### i.   Medication

In arguing that the district court inadequately assessed his understanding and knowledge, Kenney points to the following exchange at his change-of-plea hearing:

> [COURT]: Have you ever been treated for any mental or psychological problem?
>
> [KENNEY]: No.
>
> [COURT]: Are you presently taking any prescription medication?
>
> [KENNEY]: Yes.
>
> [COURT]: Is it any kind of medication that would affect your ability to understand this proceeding?  Is . . . your mind clear?
>
> [KENNEY]: I think it is.
>
> [COURT]: You're the best judge of that.
>
> [KENNEY]: Yeah.
>
> [COURT]: What, just generally, what type of medication are you taking?
>
> [KENNEY]: I take five or six of them.  I know a couple of them is like Altrum, stuff for my -- I had brain surgery and nasal surgery.  So it might be to that effect.  I'm not sure.
>
> [COURT]: Are you recovering now from the surgery or --

-16-

[KENNEY]: I'm trying.

[COURT]: Trying?

[KENNEY]: Yes.

[COURT]: But you don't feel that that impacts your ability to understand things?

[KENNEY]: Sometimes it takes me a little longer to understand.

[COURT]: But your comprehension is there, it's just that the mental processes go a little more slowly?

[KENNEY]: Yes.

[COURT]: Mr. Kenney, if I start speaking too quickly or if something seems to be passing by too quickly, let me know, and I'll rephrase it, okay?

[KENNEY]: Okay.

Kenney points out that the district court's compound inquiry -- "Is it any kind of medication that would affect your ability to understand this proceeding? Is . . . your mind clear?" -- renders his response ("I think it is") ambiguous, as it is unclear which question Kenney was answering. Because "I think it is" could be taken as an affirmative answer to the first query, Kenney suggests that this case is similar to United States v. Parra-Ibañez, 936 F.2d 588 (1st Cir. 1991), in which the defendant informed the district court at his Rule 11 hearing that he was taking "Ativan, Halcion and Restoril" and that Ativan was "a drug to control [his] nerves," id. at 591. We held that the court violated Rule 11 by failing to further inquire "what effects, if

-17-

any, such medications might be likely to have on [the defendant's] clear-headedness." Id. at 596.

We agree with the government that Parra-Ibañez is distinguishable and that our more recent decision in United States v. Morrisette, 429 F.3d 318 (1st Cir. 2005), disposes of Kenney's claim. In Morrisette, we found that the district court's questioning was "not plainly inadequate" when the court "specifically inquired whether [the defendant's named] medication . . . prevented [the defendant] from understanding what was happening during the hearing." Id. at 322. We noted that in Parra-Ibañez, by contrast, the court failed to make any such inquiry at all. Id.; see also Cody v. United States, 249 F.3d 47, 53 (1st Cir. 2001) (stating that the Parra-Ibañez court "failed to follow up with any question whatsoever about whether the defendant's medication affected his competence to plead").

Here, too, the district court's catechism was not plainly inadequate. Admittedly, as Kenney points out, the court did not seek to ascertain the name and dosage of each medication. Although it might have been advisable to do so, we have recognized that "there is certainly no settled rule that a hearing cannot proceed unless precise names and quantities of drugs have been identified." United States v. Savinon-Acosta, 232 F.3d 265, 269 (1st Cir. 2000). After asking Kenney about his medications, the court proceeded to ask him whether his recovery from brain surgery "impact[ed his]

ability to understand things" and whether his "comprehension [was] there," and Kenney responded that his mental processes had been slowed but not otherwise impaired.[7]  In light of Kenney's responses, and in the absence of other identifiable red flags in Kenney's performance at the hearing, the district court did not plainly err in opting not to inquire further.  See id. at 269 ("Courts have commonly relied on the defendant's own assurance (and assurances from counsel) that the defendant's mind is clear.").

---

[7] We recognize that the district court did not explicitly ask whether Kenney's medication impacted his understanding, and that its inquiry ("you don't feel that that impacts your ability to understand things?") was made in response to Kenney's testimony that he was trying to recover from his brain surgery.  While the best practice is certainly to make a specific inquiry regarding the effects of any medications, given the particular facts of this case, Kenney cannot demonstrate plain error.  Unlike Parra-Ibañez, no competency hearing was required in Kenney's case, see section A.1 supra, and Kenney told the district court that he had never been treated for mental or psychological problems.  The district court thus had little "reason to suspect that the medications taken by the accused might impinge upon the accused's capacity to enter a voluntary and intelligent plea."  Parra-Ibañez, 936 F.2d at 595 (emphasizing defendant's testimony that he took medication in connection with his treatment for a "mental or emotional condition").  More significantly, the district court did not abandon the impairment inquiry after learning that Kenney was taking medication; it probed further.  The district court immediately followed the discussion of medications and surgery with a question that fairly encompassed Kenney's mental impairment, whether caused by medications or by the brain surgery itself ("your comprehension is there, it's just that the mental processes go a little more slowly?").  It repeatedly questioned Kenney's understanding at each step of the hearing, and concluded by verifying generally that it had not "confused [Kenney] by anything [it] said or any question [it] asked."  These facts, particularly when considered together with the district court's express findings that Kenney was well-oriented, competent, and responsive during the change-of-plea hearing, do not support a finding of plain error for lack of greater specificity in questioning.

-19-

## ii. Voluntariness

Kenney next contends that his guilty plea was coerced, and therefore invalid, due to the threats he received from Arakelow, which led him to withdraw from his plea agreement. See United States v. Martínez-Molina, 64 F.3d 719, 732 (1st Cir. 1995) ("[A] guilty plea is involuntary and therefore invalid if it is obtained 'by actual or threatened physical harm or by coercion overbearing the will of the defendant.'" (quoting Brady, 397 U.S. at 750)). At the outset of the change-of-plea hearing, defense counsel informed the court that Kenney was withdrawing from the plea agreement, but that he would nevertheless "plead guilty and admit responsibility for all of his own actions." Kenney avers that the court, presented with this "sudden about-face," should have "ask[ed] Kenney the obvious question--why are you renouncing your plea deal only to plead guilty to everything?"

Although the district court did not pose that question, it did ask Kenney whether he was "pleading guilty willingly, freely, and voluntarily"; whether anyone "coerced [him] in a physical sense into pleading guilty"; and whether "any threats [had] been made, other than the threat of being prosecuted." Kenney's answers, which "carry a strong presumption of verity," did not indicate any coercion. Id. at 733 (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)) (internal quotation marks omitted). The district court did not need to delve any deeper.

We are not without sympathy for Kenney insofar as his co-defendant's alleged threats may have driven him to forego the benefit of a favorable plea agreement and resulted in a mandatory minimum sentence he may not otherwise have faced. But whether Kenney was coerced into withdrawing from the plea agreement is, contrary to Kenney's suggestion, a wholly distinct question from whether he was coerced into entering a guilty plea rather than going to trial. Cf. Weatherford v. Bursey, 429 U.S. 545, 561 (1977) ("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial."). Kenney fails to show how Arakelow's threats coerced him not only into withdrawing from the plea agreement but also into taking the next step of entering a bare guilty plea.[8] The district court was accordingly under no obligation to inquire into Kenney's rationale for withdrawing from the plea agreement.

### 3. Ineffective Assistance

Turning from the adequacy of the district court's Rule 11 inquiry to the performance of trial counsel, Kenney next argues that he was deprived of his Sixth Amendment right to effective assistance of counsel. Supreme Court precedent holds both that a guilty plea may be set aside due to ineffective assistance of counsel, Hill v. Lockhart, 474 U.S. 52, 58 (1985), and that "the

---

[8] Indeed, coerced withdrawal from a favorable plea agreement would if anything undermine a defendant's incentive to plead guilty rather than go to trial.

negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel," Padilla v. Kentucky, 559 U.S. 356, 373 (2010); see also Missouri v. Frye, 132 S. Ct. 1399, 1407-08 (2012). Kenney alleges a number of failings on his lawyer's part: failure to raise an entrapment defense before the court or in plea negotiations; failure to move for a competency hearing; failure to identify alternatives to the proposed expert evaluation of Kenney's mental health when the court denied Kenney's requests for funding; failure to question Kenney's decision to withdraw from the plea agreement; failure to object during the plea colloquy; and (most critically in Kenney's estimation) failure to advise Kenney to withdraw his guilty plea when given the opportunity to do so.

Faced with ineffective assistance of counsel claims on direct appeal, we have resorted to three distinct options. "First, and most typically, we respond that such claims 'must originally be presented to the district court' as a collateral attack under 28 U.S.C. § 2255" due to the paucity of the record and the district court's "better position to adduce the relevant evidence" as to whether counsel's performance was deficient and whether such deficiency prejudiced the defendant. United States v. Colón-Torres, 382 F.3d 76, 84-85 (1st Cir. 2004) (quoting United States v. Ovalle-Marquez, 36 F.3d 212, 221 (1st Cir. 1994)); see also United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993).

-22-

Alternatively, in the "comparatively rare situations" where the critical facts are undisputed and the record is sufficiently developed, we may resolve the merits of the claim on direct appeal. Colón-Torres, 382 F.3d at 85. Finally, in the "gray area between these two categories," where the record is embryonic but "contain[s] sufficient indicia of ineffectiveness," we may opt to remand for an evidentiary hearing without requiring the defendant to bring a collateral challenge. Id.

Unsurprisingly, Kenney endeavors to fit this case within the second, or at least the third, of these categories. We, however, are unpersuaded. Unlike some of the cases in which we directly considered ineffective assistance claims, the alleged deficiency here did not consist of an isolated and easily analyzed trial decision. See, e.g., United States v. Downs-Moses, 329 F.3d 253, 265 (1st Cir. 2003); United States v. Natanel, 938 F.2d 302, 310 (1st Cir. 1991). Nor is the prejudice analysis as straightforward as in a case where overwhelming trial evidence precludes any finding of prejudice. See, e.g., United States v. LaPlante, 714 F.3d 641, 651 (1st Cir. 2013). On the contrary, in this case we simply cannot know trial counsel's rationale, or lack thereof, for the challenged decisions, nor can we know whether Kenney was prejudiced by these alleged shortcomings. The record is too fraught with uncertainty to warrant either appellate resolution or remand for an evidentiary hearing. Kenney is free, however, to

-23-

follow the more common avenue of review and raise these claims in a § 2255 petition before the district court.[9]

**B.      Sentencing**

In opposing the imposition of a ten-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A), Kenney argued before the district court that the government had engaged in improper sentencing factor manipulation.  The crux of Kenney's argument was that ATF improperly expanded the scope of the planned robbery from $100,000 in cash (the amount that ATF informants initially told Kenney was hidden in the fictive apartment) to $200,000 plus five kilograms of cocaine worth up to $100,000, thereby subjecting Kenney to a ten-year mandatory minimum sentence on the drug conspiracy count.  The district court rejected this claim, relying on recorded conversations between Kenney and an ATF informant establishing Kenney's predisposition.  On appeal, Kenney raises both procedural and substantive challenges to this conclusion, averring that the district court failed to provide him sufficient notice of its reliance on the recordings and improperly evaluated his sentencing factor manipulation claim.  We address each issue separately.

--------

[9]  We direct the district court, if Kenney brings a § 2255 petition, requests counsel, and qualifies financially, to appoint counsel for him under 18 U.S.C. § 3006A(a)(2)(B).  See United States v. Ortiz-Graulau, 526 F.3d 16, 21 (1st Cir. 2008); Mala, 7 F.3d at 1064.

### 1. Notice

Both the Due Process Clause and Fed. R. Crim. P. 32 entitle a defendant to be sentenced on the basis of reliable and accurate information. See United States v. Rivera-Rodríquez, 489 F.3d 48, 53 (1st Cir. 2007); United States v. Berzon, 941 F.2d 8, 18 (1st Cir. 1991). To effectuate that guarantee, we have held that "a defendant may not be placed in a position where, because of his ignorance of the information being used against him, he is effectively denied an opportunity to comment on or otherwise challenge material information considered by the district court." Berzon, 941 F.2d at 21. Kenney claims to have been left in precisely such a plight due to the district court's reliance on recorded conversations between him and the ATF informants; although these recordings were admitted into evidence at Arakelow's trial, Kenney claims to have received insufficient notice of them because "the first time [he] was alerted that the recordings might be used at his sentencing was when he received the government's opposition to his motion for downward departure," filed on the eve of sentencing. As Kenney did not raise this argument below, we review for plain error only.

Kenney characterizes this case as much like Berzon, where we held that the district court's reliance on testimony from a co-defendant's sentencing violated due process and Rule 32 where the defendant was unaware of the testimony. In so holding, we

-25-

distinguished two cases from other circuits in which the use of evidence from a related trial was upheld, noting that in these cases, with which we "agree[d] entirely," "the facts contained in the testimony relied upon were included in the presentence report"; in Berzon, by contrast, "the testimony and argument at [the co-defendant's] sentencing included information not in the [PSR] nor otherwise in the record in Berzon's case."  Id. at 19-20 (citing United States v. Notrangelo, 909 F.2d 363 (9th Cir. 1990); United States v. Romano, 825 F.2d 725 (2d Cir. 1987)).  More recently, we adhered to this distinction in Rivera-Rodríquez, holding that the district court could rely on testimony from a co-defendant's trial where, unlike in Berzon, the information elicited at the trial concerning drug quantity and the duration of the conspiracy was "hardly new to [the defendant] and his counsel"; on the contrary, "[t]he length of the conspiracy and quantity of drugs involved were set forth in the indictment, plea agreement, and PSR."  489 F.3d at 55.

Berzon is distinguishable for the same reason here. Notwithstanding Kenney's protestations to the contrary, our review of the PSR and other documents in the record persuades us that the information upon which the district court relied had long been available to Kenney.  The numerous recorded conversations between Kenney and the ATF informants, which convinced the district court that Kenney was the "ringleader" and "mastermind" of the planned

-26-

heist, were mentioned as early as February 17, 2011, in an affidavit by an ATF special agent attached to the criminal complaint. The affidavit stated <u>inter</u> <u>alia</u> that in conversations with Informant 2, "Kenney pushed to set up the armed robbery of the drug traffickers"; that Kenney and Littlejohn asked Informant 2 "numerous questions about the location of the money in the apartment, the number of people in the apartment . . . the location of firearms and information about the neighbors"; that Kenney suggested to Informant 2 that they disguise themselves as federal agents, alluding to past robberies in which he and his "crew" had impersonated law enforcement officers; that Kenney told Informant 2 "let's do it [<u>i.e.</u>, the robbery], come on"; and that Kenney assured Informant 2 "I got all the guys you need" and asked if there were "anymore [<u>sic</u>] jobs [<u>i.e.</u>, robberies] to do." Both the pre-plea and final PSRs drew upon this affidavit, and the government also cited these conversations in summarizing its evidence at Kenney's change-of-plea hearing. This information therefore could hardly have taken Kenney by surprise at his sentencing. We accordingly find no error, plain or otherwise.

## 2. Sentencing Factor Manipulation

We have defined sentencing factor manipulation as the "improper enlarge[ment of] the scope or scale of a crime" by the government in order "to secure a longer sentence than would otherwise obtain." <u>West</u> v. <u>United States</u>, 631 F.3d 563, 570 (1st

Cir. 2011) (quoting <u>United States</u> v. <u>DePierre</u>, 599 F.3d 25, 28-29 (1st Cir. 2010)) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>United States</u> v. <u>Fontes</u>, 415 F.3d 174, 180 (1st Cir. 2005).[10] A successful claim of sentencing factor manipulation may entitle the defendant to a sentence below the statutory minimum as an equitable remedy. <u>West</u>, 631 F.3d at 570; <u>Fontes</u>, 415 F.3d at 180.

The defendant must establish sentencing factor manipulation by a preponderance of the evidence. <u>West</u>, 631 F.3d at 570. We have consistently acknowledged the onerousness of that task, describing the threshold as "very high," <u>id.</u> (quoting <u>Fontes</u>, 415 F.3d at 180) (internal quotation marks omitted), and emphasizing that the claim is available only in "the extreme and unusual case," involving, <u>e.g.</u>, "outrageous or intolerable pressure" or "illegitimate motive on the part of the agents," <u>United States</u> v. <u>Montoya</u>, 62 F.3d 1, 4 (1st Cir. 1995). Put differently, in order to succeed "the defendant must show that 'the agents overpowered [his] free will . . . and caused him to commit a more serious offense than he was predisposed to commit.'" <u>United</u>

---

[10] We have described sentencing factor manipulation as a "kissing cousin" of the entrapment defense, <u>United States</u> v. <u>Gibbens</u>, 25 F.3d 28, 30 (1st Cir. 1994), and our precedent uses interchangeably the terms "sentencing factor manipulation" and "sentencing entrapment," which other circuits have distinguished. <u>DePierre</u>, 599 F.3d at 29 n.2 (citing <u>United States</u> v. <u>Garcia</u>, 79 F.3d 74, 75 (7th Cir. 1996); <u>United States</u> v. <u>Jones</u>, 18 F.3d 1145, 1152-53 (4th Cir. 1994)).

States v. Jaca-Nazario, 521 F.3d 50, 58 (1st Cir. 2008) (quoting United States v. Barbour, 393 F.3d 82, 86 (1st Cir. 2004)).

The inquiry thus focuses "primarily on the behavior and motives of the government" in order to determine whether it engaged in "extraordinary misconduct." Id. However, as the above quote from Jaca-Nazario suggests, the defendant's predisposition to commit the charged crimes is also relevant. Although we have described predisposition as a "secondary consideration," West, 631 F.3d at 570, we have also recognized that "a finding that the defendant was predisposed to commit the crimes charged may overcome even a finding of improper motive," Jaca-Nazario, 521 F.3d at 59 n.8 (citing Fontes, 415 F.3d at 181); see also West, 631 F.3d at 571 (holding that defendant's "inability to rebut the government's evidence of predisposition . . . doomed his assertion of sentencing factor manipulation").

In rejecting Kenney's sentencing factor manipulation claim, the district court made no findings as to the propriety of the government's conduct, stating only, "I heard the tapes. There is no doubt in my mind that Mr. Kenney was the ringleader, the mastermind, so to speak, the recruiter, and an enthusiastic participant in the scheme." On appeal, Kenney contends that the court erred in relying solely on his predisposition without making any determination of whether the government had engaged in "extraordinary misconduct" by upping the ante of the heist from

$100,000 to $200,000 and five kilograms of cocaine, for which the government in turn invented a prospective buyer willing to pay up to $100,000.

Although an accompanying finding as to the government's conduct might indeed have been preferable, the district court did not err in rejecting Kenney's sentencing factor manipulation claim. As we have already stated, our precedent recognizes that a finding of predisposition, even though a "secondary" factor in the analysis, may nevertheless trump a finding of improper governmental conduct. See Jaca-Nazario, 521 F.3d at 59 n.8. Our decision in Fontes is particularly instructive: although the district court found improper motives on the part of the government (evinced by the testimony of an FBI agent who "basically admitted that the agents were trying to get a higher sentence" by purchasing crack rather than powder cocaine), we nevertheless upheld its conclusion that "evidence of [the defendant's] predisposition to sell crack was . . . devastating to his claim of sentencing factor manipulation." 415 F.3d at 181, 183 (internal quotation marks and brackets omitted). More specifically, the evidence of predisposition demonstrated that "the government, while motivated at least in part by an improper desire to increase [the defendant's] sentencing exposure, exerted no undue pressure or coercion sufficient to 'overbear the will of a person predisposed only to committing a lesser crime.'" Id. at 183 (quoting United

States v. Connell, 960 F.2d 191, 196 (1st Cir. 1992)) (internal brackets omitted).  The same conclusion was justified here.[11]

Nor are we persuaded by Kenney's accompanying argument -- raised for the first time on appeal and therefore subject to plain error review only -- that the district court's failure to account for his "weakened mental state" undermined its finding of predisposition.  Although there may well be cases in which a defendant is left particularly susceptible to governmental inducement as a result of mental impairment, thereby affecting the sentencing factor manipulation analysis, Kenney points to no evidence that his is such a case.  The only basis Kenney offers for this argument is the district court's statement at sentencing that it would "take into account" the evidence concerning changes in Kenney's personality.  But even if the district court agreed that Kenney's mental state was relevant to his culpability, that alone hardly compels the additional inference that Kenney's impairment

_____

[11]  To the extent Kenney challenges the factual basis for the district court's finding of predisposition, which we review for clear error only, Fontes, 415 F.3d at 181, we find that Kenney's recorded conversations (discussed at greater length in section B.1 supra) amply supported the district court's finding that Kenney was predisposed to commit the crime.  Among other things, Kenney boasted of his previous participation in robberies; recruited Arakelow and Littlejohn; asked the ATF informant about the presence and location of cocaine in the apartment; and agreed to wait until the arrival of the fictitious cocaine shipment before robbing the apartment.  The district court could certainly infer from this evidence that Kenney's "actions were not the forced result of intolerable pressure" and instead reflected his own predisposition. West, 631 F.3d at 571.

also rendered him more vulnerable to the sting operation or less predisposed to the crime.  We accordingly find no error, plain or otherwise.[12]

### III.

For the foregoing reasons, we **affirm** Kenney's conviction and sentence.

---

[12]  We also reject Kenney's related argument that the district court abused its discretion in denying his motion to reconsider his prior requests for CJA funding for a complete psychiatric evaluation.  The district court had already granted Kenney a total of $6,000 to fund the examination; Kenney offers no rebuttal to the district court's conclusion that his request for an additional $6,000 (bringing the total amount to $12,000) was "excessive given the usual charges for examinations of its type."