# United States Court of Appeals
## For the First Circuit

No. 23-1685

UNITED STATES OF AMERICA,

Appellee,

v.

DOMINICK BAILEY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]
[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Kayatta, Selya, and Aframe,
Circuit Judges.

David J. Nathanson, with whom Wood & Nathanson, LLP was on
brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Joshua S. Levy, Acting United States Attorney, was on brief,
for appellee.

November 20, 2024

**AFRAME, Circuit Judge.** This is an appeal from defendant-appellant Dominick Bailey's guilty plea in the District of Massachusetts to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). This is Bailey's third felon-in-possession conviction. In 1997, Bailey pleaded guilty to the same offense in the District of Vermont, resulting in a thirty-seven-month sentence. And, in 2006, Bailey again pleaded guilty to this offense in the District of New Hampshire, resulting in a forty-one-month sentence. This time, the district court sentenced Bailey to eighty-seven months of imprisonment. In imposing this sentence, the court departed upward from the advisory sentencing guideline range to account for Bailey's "horrific record."

In the district court, Bailey objected only to the sentencing departure. On appeal, he challenges all aspects of the proceedings, alleging that (1) the indictment violated his rights under the Second Amendment to the United States Constitution, (2) his guilty plea was involuntary and unknowing, (3) the sentencing proceeding was infected by procedural error, and (4) the sentence imposed was substantively unreasonable. Bailey's unpreserved claims are either waived or fail to meet the plain error standard, and the court did not abuse its discretion by imposing an upward sentencing departure.

**THE OFFENSE AND DISTRICT COURT PROCEEDINGS**

We begin by describing the offense conduct, relying on uncontested information in the presentence report and Bailey's admissions at the change-of-plea hearing. See United States v. Trahan, 111 F.4th 185, 188 (1st Cir. 2024) (citing United States v. Spinks, 63 F.4th 95, 97 (1st Cir. 2023)).

In July 2019, Bailey and his co-conspirator, Glenn Lacedra, contacted a methamphetamine dealer working as a confidential informant to propose a guns-for-drugs transaction. Lacedra introduced the informant to Bailey, who was to serve as the source of the guns. Lacedra agreed to "middle" the deal between Bailey and the informant. Months of start-and-stop negotiations ensued, first with the informant and then with an undercover agent posing as the informant over text message.

During these negotiations, Bailey was upfront in admitting to the undercover agent that he could not purchase firearms because of his felon status.[1] Still, Bailey stated that he had certain firearms in his possession to trade and that a

---

[1] Bailey, in fact, was upfront about much with the agent. During one exchange, he boasted about a prior federal felon-in-possession conviction for trafficking "300 guns," remarking that he was a firearms "entrepreneur." He also cogently explained the difference between actual and constructive possession of a firearm under federal law, and why it is advantageous to plead incompetency when facing a state charge but better to "tak[e] it on the chin and not try[] the incompetent nonsense" in federal court.

- 3 -

friend had an additional gun available for the transaction. Bailey followed up by sending the agent a picture of two pistols and a rifle with the comment that he had those firearms "right now" and was "ready to do some business with [him]." Ultimately, Bailey and the agent settled on Bailey bringing three pistols and a rifle to Boston to exchange for drugs.

On November 14, 2019, Lacedra drove to Vermont to retrieve Bailey and the guns. Bailey brought a .22 caliber firearm and a duffle bag containing an AR-15 rifle and two pistols. When Bailey and Lacedra arrived at the agreed-upon meeting place in Boston, Massachusetts, they were confronted by various federal and state law enforcement officials. The officials arrested Bailey and Lacedra; they also seized the duffle bag containing the three guns from the backseat and the .22 caliber firearm from the rear pocket of the driver's seat.

In January 2020, a grand jury indicted Bailey on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2, under principal and aiding-and-abetting theories. Almost a year later, during the COVID-19 pandemic, Bailey pleaded guilty without a plea agreement during a virtual proceeding that he attended from his home in Vermont. In August 2023, the district court sentenced Bailey to eighty-seven months of imprisonment. Bailey appealed.

## THE INDICTMENT

On appeal, Bailey argues that the indictment was unlawful because it violated his right under the Second Amendment to "keep and bear Arms." U.S. Const. amend. II. Bailey claims that the Second Amendment renders § 922(g)(1) unconstitutional, both facially and as applied to him because none of his prior convictions involved him "seriously physically harming another human."

Bailey did not raise a Second Amendment challenge in the district court. The government contends that he waived this argument by not timely moving to dismiss on Second Amendment grounds, as required by Federal Rule of Criminal Procedure 12(b)(3). Rule 12 provides that, absent good cause shown, Fed. R. Crim. P. 12(c)(3), a defendant must raise pretrial any claim alleging "a defect in the indictment," including that it "fail[s] to state an offense," where the claim was "reasonably available" and could have been resolved "without a trial on the merits," id. at 12(b)(3). The government contends that a Second Amendment challenge to an indictment falls within the purview of this Rule. Where the defendant fails to timely raise a claim covered by Rule 12(b)(3) without demonstrating good cause, the defendant "is not entitled to plain error review" on appeal. United States v. Lindsey, 3 F.4th 32, 42 (1st Cir. 2021).

Here, despite having multiple opportunities to do so, Bailey has offered no response to the government's argument that his Second Amendment claim is within the scope of Rule 12(b)(3)'s raise-or-waive provision. Nor has he attempted to demonstrate good cause for failing to move to dismiss his indictment in the district court. We will not rescue an appellant who "buries his head in the sand and expects that [the] harm will pass him by." United States v. Arroyo-Blas, 783 F.3d 361, 367 (1st Cir. 2015). Because Bailey has entirely failed to address the government's Rule 12 argument, he has waived his Second Amendment claims. See id.

**THE CHANGE OF PLEA**

Bailey argues that his Federal Rule of Criminal Procedure 11 plea proceeding was defective in two respects. First, Bailey contends that the district court failed to determine whether he pleaded guilty voluntarily because it insufficiently inquired into the potential effects of Bailey's mental health conditions and medication use on his comprehension of the proceedings. Second, Bailey claims that the court's confusing description of the charge made it impossible for him to understand the elements of the offense to which he admitted guilt.

Bailey did not present either argument to the district court. We therefore review for plain error. See United States v. Williams, 48 F.4th 1, 5 (1st Cir. 2022) (citing United States v.

Vonn, 535 U.S. 55, 58-59 (2002)).  Thus, to succeed, Bailey must establish that there was a "clear or obvious" error which "affected [his] substantial rights" and seriously impaired "the fairness, integrity or public reputation of [the] judicial proceedings." Id. (alterations in original) (citing United States v. Kitts, 27 F.4th 777, 784 (1st Cir. 2022)).  "In applying plain error analysis in guilty plea cases, a defendant must, in order to demonstrate that his substantial rights were affected, 'show a reasonable probability that, but for the error, he would not have entered the [guilty] plea.'"  United States v. Caraballo-Rodriguez, 480 F.3d 62, 69 (1st Cir. 2007) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 83 (2004)).

### I.    Voluntary Plea

We begin with Bailey's challenge to the adequacy of the district court's inquiries into the effects of his mental health conditions and medication use on the voluntariness of his plea. See United States v. Kenney, 756 F.3d 36, 45 (1st Cir. 2014) (explaining that Fed. R. Crim. P. 11(b) requires a district court "to determine that the defendant's guilty plea is knowing and voluntary").

The district court heard early in the Rule 11 colloquy about Bailey's mental health history and medication use.  Bailey reported that he had been receiving disability benefits since approximately 1995, when he sustained a skull fracture during an

- 7 -

assault that resulted in a traumatic brain injury and posttraumatic stress disorder. When asked if there was "[a]nything about [his] experience with the disability" that would interfere with his ability to understand his case and the change-of-plea proceeding, Bailey replied, "No. I understand. Just some things I need explaining. But other than that, no. I understand what's going on." The court responded by advising Bailey that he could seek clarification at any point during the plea colloquy.

The district court next asked Bailey about his substance abuse history. Bailey explained that he "got into drugs" to avoid "bad dreams and nightmares," which began after his head injury. In response to further inquiry, Bailey identified cocaine as his drug of choice but reported to be "doing great" after rehabilitation and estimated that he had not used cocaine in ten to fifteen years. Later in the hearing, Bailey's counsel advised that Bailey had "passed every drug test" while on pretrial release.

Bailey also disclosed that he suffers from bipolar disorder and volunteered that he had "come a long way" in managing the condition through ongoing work with a therapist. The district court responded with questions regarding Bailey's use of medication to moderate his symptoms; he reported taking lithium "as needed," explaining his therapeutic range is ".05 to 1," but that he can sense "when [he is] getting [] manic" and will "go to

counseling and take [his] meds . . . ." In response, the court

asked about Bailey's present ability to understand the proceeding:

> THE COURT: So let's talk about right now.
>
> THE DEFENDANT: Yeah, I'm fine. I'm taking my meds and everything. I'm fine. I'm doing good. And I go to therapy, every two weeks I go and stuff, yeah.
>
> THE COURT: Okay. But for right now, for this occasion, are you in a position to make a clear-eyed judgment about a very important matter like this?
>
> THE DEFENDANT: Yeah, yes, yes, I'm clear, yes.
>
> THE COURT: Okay.
>
> THE DEFENDANT: I understand, yes.

The district court confirmed that Bailey's mental health

center provided both counseling and psychiatric treatment

services. It also asked if Bailey's mental health condition could

be "broadly categorized as bipolar issues." He replied, "I think

so, yeah, bipolar and whatever. There's some other diagnosis I

was told, but yes." The court responded by inquiring further into

Bailey's medication use:

> THE COURT: Let's turn to your current situation. You have [l]ithium that you're taking?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: Any other prescription drugs?
>
> THE DEFENDANT: I got a whole list. I have a hard time pronouncing it. I take Adderall. I take blood pressure meds. I take [l]ithium.

- 9 -

I take stuff for side effects and anxiety, too. I take a bunch of different meds.

THE COURT: Without getting into the specifics of it, the reason I'm asking about the drugs is, are any of those interfering with your ability today --

THE DEFENDANT: No.

THE COURT: -- to tell me whether or not you're ready to plead guilty to this very serious felony?

THE DEFENDANT: No, no, they're not interfering with me understanding what you're saying, Your Honor.

The court ultimately accepted Bailey's guilty plea, concluding that his "decision to plead guilty [was] knowing and voluntary."

A district court should inquire into a defendant's mental health status to establish that a guilty plea is knowing and voluntary because "impaired mental or emotional capacity can interfere with [a defendant's] ability to understand what he is being told and to exercise rational choice." United States v. Pattee, 820 F.3d 496, 508 (2d Cir. 2016). So too should a court inquire about the effects on comprehension caused by a defendant's medication use. See United States v. Savinon-Acosta, 232 F.3d 265, 268 (1st Cir. 2000) ("[M]edication can in some circumstances affect a defendant's mental state to a degree that undermines the defendant's ability to enter a voluntary plea.").

The sufficiency of these inquiries depends on whether there is an adequate record to support the district court's finding

- 10 -

that a defendant pleaded guilty voluntarily.  See Savinon-Acosta, 232 F.3d at 268 (emphasizing that "[t]he critical question" is whether the defendant suffers from any impairment during a change-of-plea hearing that presently affects his ability to comprehend).  Several factors are relevant, including "the defendant's own assurance (and assurances from counsel) that the defendant's mind is clear," the court's observations of the defendant, and the defendant's performance throughout the proceeding.  Id. at 268-69; see also United States v. Morrisette, 429 F.3d 318, 323 (1st Cir. 2005).

Here, the district court inquired into both Bailey's mental health and medication use.  Regarding mental health, the court asked Bailey about the injury that caused certain of his mental health conditions and the nature of those conditions.  The court also inquired into the consequences of his conditions, including his difficulty in maintaining employment and issues with substance abuse.  The court sought and received Bailey's assurances that he was receiving appropriate mental health services and was no longer using non-prescribed drugs.  As to his prescribed drugs, the court asked Bailey about the medications that he was presently taking.  Bailey provided the court with a partial list, and the court asked him about the effects that the drugs had on his comprehension.

The record contains multiple assurances from Bailey that he understood the proceeding and the significance of pleading guilty. When asked about the effect of his mental health conditions on his ability to comprehend, Bailey stated that he "underst[ood] what[] [was] going on." Similarly, after telling the district court that he was taking lithium, Bailey was asked whether he was "in a position to make a clear-eyed judgment about a very important matter," and he replied in the affirmative. And, after Bailey disclosed that he was taking medication in addition to lithium, he told the court that none of those drugs were "interfering with [his] understanding what [the court] [was] saying."

Bailey's assurances were consistent with his conduct during the remainder of the proceeding. The record shows that Bailey paid close attention to the district court's description of the potential penalties and offense elements and the government's recitation of the evidence. For example, when the subject of forfeiture came up, Bailey interjected with an attempt to suggest that he did not own the guns at issue. Bailey's efforts to contest ownership of the guns at that juncture demonstrated an understanding that the government could only seek forfeiture of property which he owned and underscores that he was following along closely.

Further, after he attempted to minimize his offense conduct by denying ownership of the firearms at issue, Bailey spoke with his counsel privately before admitting the essential facts of the offense. See Fed. R. Crim. P. 11(b)(3). The district court then asked Bailey's counsel if there was "any reason [the court] shouldn't accept [the] plea." Counsel responded that there was no such reason. Defense counsel's agreement that the court could accept the plea immediately after talking to Bailey about the case also supports that Bailey understood the proceeding and the nature of his decision to plead. See, e.g., Miranda-Gonzalez v. United States, 181 F.3d 164, 167 (affirming validity of plea where defendant consulted with counsel and counsel did not "voice[] an objection" when later asked by the court "whether [he] had any doubts as to [the defendant's] competence to enter the guilty plea"). Given the court's inquiries, Bailey's assurances, counsel's comments, and Bailey's behavior during the Rule 11 proceeding, we conclude that the district court did not plainly err in determining that Bailey voluntarily pleaded guilty.

Bailey argues otherwise. He focuses on the district court's failure to obtain a full list of his medications and to follow-up sufficiently when he provided a response that suggested that he might not have been taking lithium as prescribed. But there is "no settled rule that a hearing cannot proceed unless precise names and quantities of drugs have been identified."

- 13 -

Savinon-Acosta, 232 F.3d at 269.[2]  Thus, we have held that a plea colloquy was adequate where, after learning that a defendant took lithium for a mental health condition, the district court asked the "[m]ost important[]" question of whether the medication affected the defendant's "ability to make reasoned decisions," and received an assurance from the defendant that the medication had no such effect.  United States v. Cody, 249 F.3d 47, 53 (1st Cir. 2001).

The district court followed the same approach here. After learning that Bailey was medicated, the court "[m]ost importantly" ascertained that Bailey did not believe the drugs were affecting his ability to comprehend the proceedings.  Cody, 249 F.3d at 53.  Bailey's conduct during the remainder of the proceeding aligned with that assurance.  See Savinon-Acosta, 232 F.3d at 269.  While the court could have asked more questions about the details of Bailey's medication regimen, see id., we conclude that it did not clearly or obviously err by declining to do so.

Bailey's reliance on United States v. Parra-Ibanez, 936 F.2d 588, 595-96 (1st Cir. 1991), to support his contrary argument is unavailing.  There, we remanded after the district court learned that the defendant was taking tranquilizers and "failed to follow

---

[2]     Even though a district court is not required to ascertain specific information about the medication a defendant is taking, we have stated before and reiterate here that the best practice is for a court to do so.  See id. at 269.

up with any question whatsoever about whether the defendant's medication affected his competence to plead." Cody, 249 F.3d at 53 (describing the error committed by the district court in Parra-Ibanez); see also Miranda-Gonzalez, 181 F.3d at 166 ("The absolute failure to investigate further once apprised of the recent ingestion of drugs doomed the plea entered by the defendant[] in Parra-Ibanez . . . ."). Here, in contrast, the district court did not ignore the effect of Bailey's prescriptions on his ability to plead, instead asking Bailey about how his drug regimen affected his comprehension and waiting until he confirmed that he was clear-minded before proceeding.

Finally, Bailey says that there were certain "red flags" which should have prevented the district court from accepting his assurances about his ability to voluntarily plead guilty. In this regard, Bailey points first to the fact that he suffers from multiple mental health conditions. But, as addressed above, the district court inquired about these conditions and had the opportunity to observe Bailey's answers in deciding whether his assurances about being clear-minded were worthy of belief. See United States v. Rodríguez-Leon, 402 F.3d 17, 25 n.8 (1st Cir. 2005) (declining to second-guess district court's assessment of defendant's assurances because "the district judge had the benefit

of directly perceiving [the defendant's] demeanor" as he answered the court's questions).[3]

Bailey also identifies a moment in the hearing when he expressed confusion about whether the district court was asking him about his prior illegal drug use or his present prescription regimen. But the record demonstrates that Bailey's confusion was due to a lack of clarity in the question. Bailey's willingness to seek clarification when he was unsure about an unclear question reinforces that he was lucid during the sentencing hearing.

Lastly, Bailey argues that the district court should have been concerned because he required time to speak with his attorney about the offense conduct after he tried to disavow ownership of the firearms at issue. But an attempt to minimize culpability without jeopardizing the acceptance of the plea does not typically suggest a lack of understanding of the proceedings. Rather, it shows a defendant who has a nuanced appreciation of the relevant legal issues and is trying to present himself in the best light possible while still pleading guilty.[4] In short, rather than

---

[3]     Bailey argues that the court could not gain a fair reading of his comprehension of the proceeding because it was conducted by video teleconference. But, during COVID-19, criminal proceedings by video were common, and the district court did not suggest it was having difficulty observing Bailey's demeanor because of the remote nature of the proceeding. See Gould Elecs. Inc. v. Livingston Cnty. Rd. Comm., Nos. 20-2257/2267, 2022 WL 1467650, at *4 (6th Cir. May 10, 2022) (observing the ubiquitous use of videoconferencing technology during the COVID-19 pandemic).

[4]     This conclusion is consistent with Bailey's

- 16 -

presenting red flags about his ability to comprehend, Bailey's behavior during the proceeding "bore out [his] claim of clearheadedness." Savinon-Acosta, 232 F.3d at 269.[5] While there may be cases in which a defendant's erratic conduct during a Rule 11 proceeding would mandate a district court inquiring further before accepting a guilty plea, this was not one of them.

## II. Understanding the Charge

Bailey's second argument is that he did not understand the nature of the charge to which he was pleading. Rule 11 requires that a district court "inform the defendant of, and determine that the defendant understands, . . . the nature of each charge to which the defendant is pleading." Fed. R. Crim. P. 11(b)(1)(G). However, "[t]he manner in which the charge is explained and the method for determining the defendant's understanding of the charge will vary from case to case depending upon the complexity of the charges, the capacity of the defendant, and the attendant circumstances." United States v. Cotal-Crespo, 47 F.3d 1, 6 (1st Cir. 1995). "[I]t is not necessary that the explanation of the charges come directly from the court. . . if it can be discerned

conversations with the undercover agent in which he demonstrated a nuanced understanding of federal firearms law.

[5] Bailey also points to the presence of his dog in the room during the proceeding as a distraction. Bailey, however, did not indicate that he was distracted by the dog, and cogently explained to the court that he lived in a small apartment such that there was nowhere else the dog could easily go.

from a review of the proceeding that the defendant nevertheless understood the charges."  Id. at 5 (citing United States v. Allard, 926 F.2d 1237, 1246 (1st Cir. 1991)).

Here, the district court began by confirming that Bailey had discussed the elements of the felon-in-possession charge with his counsel.  The court then summarized each element and explained that possession can be either "direct" or "constructive."  It also stated that "the government could prove [the charge] as they allege by saying [Bailey] [is] an aider and abett[o]r," and recited the elements of aiding and abetting.  After concluding its recitation of the elements, the court asked Bailey whether he had "any questions [] about what the government has to prove[,]" to which he responded, "No, I don't, Your Honor."

The government then provided its recitation of the offense conduct.  The government described Lacedra as the individual who facilitated the contemplated guns-for-drugs transaction and Bailey as "the source of the guns."  At the conclusion of the government's presentation, the court asked Bailey if he "disagree[d] with anything [the government] said."

Bailey responded by seeking clarification regarding the government's statement that he had firearms "available to deliver to the undercover agent," which the government clarified by explaining that "[Bailey] traveled from Vermont to Massachusetts with Mr. Lacedra in the driver['s] seat and himself in the

passenger seat, and they transported firearms in Mr. Lacedra's vehicle from Vermont to Massachusetts." Bailey offered the following in response:

> THE DEFENDANT: Okay, okay. . . . I got a question, Your Honor. Mr. Lacedra came to Vermont and purchased them guns and stuff from somebody else. I didn't understand. Okay.

After further discussion about Bailey's role in the offense, the district court asked Bailey to confer with his counsel. The court re-engaged Bailey after the break:

> THE COURT: All right. So Mr. Bailey, you've had a chance to talk to your attorney. Let me pose the question in this fashion. [The government] has told us that there were guns in the vehicle that you traveled in from Vermont to Massachusetts with Mr. Lacedra. You've told me that you weren't the source of those guns, you didn't sell those guns. Is that right?
>
> THE DEFENDANT: I -- I didn't understand the question. I was the source of the guns, but they weren't mine personally. That's all.
>
> * * *
>
> THE COURT: Okay. But let me understand what you're saying. You got the guns from someone else. You didn't sponsor the transaction by which the guns were originally acquired. Is that right?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Okay. And did you then pass them on to Mr. Lacedra?
>
> THE DEFENDANT: Yes.

- 19 -

THE COURT: And you assisted Mr. Lacedra by driving down to Massachusetts. . . with those guns?

THE DEFENDANT: Yes.

THE COURT: And that's because you were the person who was passing them on to Mr. Lacedra; is that right?

THE DEFENDANT: Yes.

THE COURT: Any question about that in your mind?

THE DEFENDANT: No. I didn't hear -- I didn't hear right when he first asked it. . . .

On appeal, Bailey emphasizes that he initially denied being the source of the guns and stated that Lacedra had purchased the guns from someone else. After offering this denial, Bailey asserts that the district court guided him towards pleading guilty to an aiding-and-abetting theory without explaining that such a theory required proof that he knew that Lacedra had previously been convicted of a crime punishable by more than one year in prison. Bailey thus contends that the plea colloquy was "too confusing" to meet Rule 11's requirements.

We do not discern any clear or obvious error in the district court's explanation. While Bailey may have exhibited some initial confusion about the government's characterization of his role in the offense, he conceded, after conferring with his counsel, that he was the "source" of the guns, that he "pass[ed] [the guns] on" to Lacedra, and that he "assisted" Lacedra by

"driving down to Massachusetts. . . with [the] guns." These admissions demonstrate that he had at least a "basic understanding of the conduct which the government alleged was criminal." United States v. Ferguson, 60 F.3d 1, 3 (1st Cir. 1995).

Though the district court did not specifically explain that an aiding-and-abetting theory required proof that Bailey knew Lacedra was a felon, the government stated during its description of the offense conduct that Bailey "knew that Mr. Lacedra was prohibited from possessing a firearm. . . because [Mr. Lacedra] is also a convicted felon. The defendant knew this because he and Mr. Lacedra had served portions of their prior federal sentences together at a federal prison in Devens, Massachusetts." Bailey offered no objection to that aspect of the government's recitation of facts even though he objected to other portions. It is thus far from obvious that Bailey misunderstood the nature of the charge to which he pleaded guilty.

Moreover, Bailey has failed to make a sufficient showing that he would have opted to go to trial had the district court provided a more robust explanation of the aiding-and-abetting theory. See United States v. Santiago, 775 F.3d 104, 106-07 (1st Cir. 2014). In examining the whole record, see id. at 107, the evidence that Bailey unlawfully possessed the weapons as a principal was strong, and there is no apparent defense that would

have motivated him to elect a trial had he been told more about aiding and abetting.  See Dominguez Benitez, 542 U.S. at 85.

Based on the undisputed facts as described in the presentence report, Lacedra was the facilitator of the transaction and expected to receive only a small quantity of drugs as a commission for his services.  The communications between Bailey and the undercover agent demonstrate that Bailey was orchestrating the gun transaction.  He specifically communicated to the agent that he had "the 9 and 22" and that his "friend ha[d] the other 9," adding, "I have all of them on me."  Bailey then sent the agent a photograph of two pistols and a rifle, writing: "I have all these right now and I'm ready to do some business with you.  So let me know when [Lacedra] can come get me."  Bailey was subsequently arrested after he traveled with Lacedra to the proposed transaction location in a car containing firearms of the types he claimed to possess when communicating with the agent.  This was overwhelming evidence of Bailey's constructive possession of the firearms in Lacedra's car when he was arrested.

The only point at which Bailey suggested that the guns were not in his possession was when he tried to minimize his culpability at the change-of-plea hearing by shifting primary blame to Lacedra.  Given the overwhelming amount of evidence showing that he was the principal for the felon-in-possession count, there is no basis to conclude that Bailey would have elected

to go to trial had the district court only provided a more fulsome aiding-and-abetting explanation.  See Dominguez Benitez, 542 U.S. at 85 (identifying the "overall strength" of the government's case and absence of "possible defenses" as factors undermining the probability that a defendant would have gone to trial absent a Rule 11 error).

## THE SENTENCING

Following Bailey's guilty plea, the probation officer filed a presentence report that calculated the advisory guideline sentencing range as 51 to 63 months based on a total offense level of 23 and a criminal history category of II.  The presentence report, which dedicated over thirty-five pages to detailing Bailey's criminal history, concluded that an upward departure could be warranted because the assigned criminal history score "underrepresent[ed] the seriousness of [his] criminal history and [the] likelihood of recidivism."  See U.S.S.G. § 4A1.3.  Bailey objected to "the potential departure identified," but probation did not change the report.

In its sentencing memorandum, the government characterized Bailey as a "lifetime criminal" and requested a sentence of ninety-six months "to specifically deter [him] from continued criminal behavior."  The government argued that Bailey's criminal history score "grossly underestimate[d] his criminal history" because many of his prior sentences, including one of his

prior federal convictions, were excluded from the guideline calculation due to their age. The government inventoried Bailey's prior convictions for more than fifteen different offenses spanning a broad range of conduct, including assault, lewd and lascivious conduct, falsifying physical evidence, possession and receipt of stolen property, forgery, stalking, unauthorized removal of human remains, and multiple violations of abuse prevention orders. The government also detailed evidence suggesting that Bailey engaged in criminal conduct while on pretrial release in the pending case.

Bailey, in his sentencing memorandum, asked the district court to not apply an "upward variance," asserting that a low-end guideline sentence of thirty-three months would be sufficient under the circumstances. He contended that his admittedly "lengthy criminal history" was a reflection of "both his age and [] struggles" with mental illness and substance abuse, and characterized "the vast majority" of his recent convictions as driving-related offenses attributable to living "in a rural community without public transportation." He concluded by identifying "addiction" as "the catalyst" for the present offense and argued that he would pose "little risk of reoffending" so long as he maintained his sobriety.

At the sentencing hearing, the government again noted Bailey's extensive criminal record. The government also

referenced communications with the undercover agent in which Bailey boasted that he was a firearms "entrepreneur." The government noted that Bailey's criminal history had been a category VI at his most recent federal sentencing but was now only a category II because of the passage of time. Ultimately, the government reiterated its request for a ninety-six-month sentence, which would "bring [Bailey] into Criminal History Category V."

Bailey reiterated his request for a thirty-three-month sentence. Bailey's sentencing argument emphasized his history of substance abuse and offered explanations for the multiple instances in which he violated the terms of his home incarceration, including by allegedly participating in post-arrest criminal conduct. Regarding his prior convictions, Bailey acknowledged having "a lengthy criminal record" but argued that "a majority of those criminal offenses" were for traffic-related offenses and many others were non-violent or "the equivalent of criminal harassment claims." He also noted in passing that the most recent conviction listed in the government's sentencing memorandum was from 2009. In sum, Bailey argued, the government's characterization of his record as "terrible" and suggestion that he "wouldn't be safe in society" were "a little misleading."

The district court ultimately imposed an upward departure, explaining its rationale as follows:

You are apologizing, which is appropriate, and you are acknowledging that you have a problem. Obviously, you do with substance abuse and that is something that you're going to have to work on the rest of your life. My duty is to impose a sentence that is appropriate for the crime that was committed by the defendant in front of me. I have to think not only about you but about the victims of your crime and about the necessity to deter anybody else from doing crimes of a similar nature.

You stand convicted of a serious crime of being a felon in possession of firearms, and not just any firearms. One of them was an assault rifle. And this is not the first time that you have been convicted of such a crime or the exchange of drugs for guns. In fact, it's the third time that you've been convicted for the very same crime.

You are very experienced in the criminal behavior side of life. In fact, I think I have not seen in my many years a longer section of a criminal report. It's 36 pages long. It records 38 convictions, two pending charges, one for a violation of a protective order, and the other for receiving stolen goods. And it reports 40 other arrests. By my calculation, that's one conviction and one arrest for every year of your adult life. And it includes crimes such as simple assault, lewd and lascivious behavior, disorderly conduct, possession of stolen goods, unlawful trespass, receiving stolen property, issuing bad checks, disturbing the [peace], falsifying physical evidence, criminal mischief, uttering forged instruments, violation of abuse prevention orders, stalking, unauthorized removal of human remains, and multiple women have obtained restraining orders against you. That's a horrific record, Mr. Bailey.

At least up to this point in your life, you have shown no intent or effort to abide by the law or to avoid committing crimes, so you do deserve a sentence that either upwardly

- 26 -

departs or is applicable to the very highest end of the range that is applicable to you, not only to stop you from committing such crimes every time you get a chance, but also to deter anyone else who thinks he can do likewise and get away with it.

I am going to depart upward from the guideline range not as far as the government would have me, but it is intended to send a message to you. It is my opinion that Criminal History Category II underrepresents the seriousness of your criminal history and the likelihood of recidivism such that an upward departure pursuant to Guideline Section 4A1.3 is warranted and, therefore, I am going to apply one.

The court sentenced Bailey to eighty-seven months of imprisonment.

Bailey challenges both procedural and substantive aspects of his sentence. Procedurally, he contends that the district court misapplied U.S.S.G. § 4A1.3, failed to adequately explain its chosen sentence or file a sufficient written statement of reasons, and relied on erroneous facts and irrelevant information. Substantively, he asserts that the sentence was too harsh because the court did not adequately consider his mitigating personal circumstances.

"[W]e first determine whether the sentence imposed is procedurally reasonable and then determine whether it is substantively reasonable." United States v. Ramirez-Ayala, 101 F.4th 80, 86 (1st Cir. 2024) (citing United States v. Reyes-Torres, 979 F.3d 1, 6-7 (1st Cir. 2020)). At both stages, we review preserved claims for abuse of discretion. United States v. Leach,

89 F.4th 189, 195 (1st Cir. 2023). Under that rubric, "we review the sentencing court's findings of fact for clear error and questions of law . . . de novo." United States v. Carrasquillo-Vilches, 33 F.4th 36, 41 (1st Cir. 2022) (citing United States v. Rivera-Morales, 961 F.3d 1, 15 (1st Cir. 2020)). Unpreserved claims are reviewed for plain error. United States v. Contreras-Delgado, 913 F.3d 232, 238 (1st Cir. 2019). Virtually none of Bailey's procedural claims are preserved. Thus, we apply abuse of discretion review only to the preserved substantive reasonableness claim and the claim that the district court failed to file an adequate written statement of reasons. See United States v. Fletcher, 56 F.4th 179, 190 (1st Cir. 2022).

## I.  Procedural Reasonableness

Bailey's first procedural contention is that the district court improperly ordered an upward departure under U.S.S.G. § 4A1.3 because it considered certain prior sentences that the guideline commentary excludes from consideration. Section 4A1.3 permits an upward departure where "the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." Id. § 4A1.3(a)(1). The guidelines do not count certain prior sentences in figuring criminal history because of their age. Id. § 4A1.2(e). The guideline commentary states, however, that a court may consider a

sentence too old to factor into the criminal history calculation to fashion an upward departure under § 4A1.3 if the earlier sentence "is evidence of similar, or serious dissimilar, criminal conduct." Id. § 4A1.2, cmt. 8.

Bailey contends that, in applying § 4A1.3, the district court did not comply with U.S.S.G. § 4A1.2, commentary note 8 because it relied on "outdated convictions for minor, dissimilar misconduct." In particular, Bailey says that the court erroneously relied on old sentences for "crimes such as trespass and disorderly conduct" to impose the departure. He argues that these crimes are neither serious nor like the charged offense.

While he objected generally to the district court's imposition of an upward departure based on his prior convictions, Bailey never asserted below that the court had to analyze his criminal record on a sentence-by-sentence basis. United States v. Reyes-Correa, 81 F.4th 1, 10 (1st Cir. 2023) (stating that to preserve an argument for appeal, the argument presented below must "be sufficiently specific to call the district court's attention to the asserted error" (quoting United States v. Soto-Soto, 855 F.3d 445, 448 n.1 (1st Cir. 2017))). We thus apply plain error review.

There was no plain error for several reasons. We have held that there is no requirement that a district court, in imposing an upward departure under § 4A1.3, make specific findings

about which of the prior convictions represent "similar, or serious dissimilar, criminal conduct" so long as the court relies on "reliable information" in making those determinations. See United States v. Footman, 215 F.3d 145, 156 (1st Cir. 2000). Here, the district court did point to obvious similar conduct when it referenced Bailey's first federal conviction for being a felon-in-possession of a firearm. There was also nothing plainly wrong with the court viewing many of Bailey's other prior sentences as arising from serious, dissimilar conduct, including (1) an assault in which Bailey broke the victim's nose; (2) lewd and lascivious conduct in which Bailey exposed himself to a woman, stating "[d]o you want it baby?"; (3) possession of stolen property in which Bailey possessed over $100,000 in property obtained from sixteen burglaries; and (4) stalking where Bailey violated an abuse prevention order.

Finally, Bailey has not shown that he was likely to receive a lower sentence if the district court had excluded from consideration his sentences for offenses such as trespass and disorderly conduct. See United States v. McCullock, 991 F.3d 313, 318 (1st Cir. 2021). Given the length of his record and the court's stated objectives of public protection and deterrence, there is no basis to think that removing from consideration a few of Bailey's many prior convictions would have changed the court's bottom-line

- 30 -

conclusion that an "upward departure" was warranted to reflect his "horrific record."

Bailey's next procedural contention is that the district court's departure explanation was inadequate in two respects. First, he suggests that the impact of his mental health conditions was the thrust of his argument minimizing the seriousness of his record and, accordingly, it was incumbent on the district court to address his mental health specifically in its departure explanation. We disagree. Bailey did not contend at the sentencing hearing that his mental health conditions explained his prior criminal conduct; rather, he argued that the government had overstated the seriousness of his record because of the allegedly trivial nature of many of the offenses.[6] Thus, Bailey criticizes the court for failing to address an argument he did not develop.

Moreover, at the sentencing hearing, when Bailey discussed his personal mitigating circumstances as they related to the present offense, he focused mostly on his substance abuse problem, not his mental health conditions. He described how the pain medications he received for his head injuries had led him to

_____

[6] In his sentencing memorandum, Bailey asserted that "[h]is lengthy criminal history reflects both his age and [his] struggles [with mental illness and substance abuse]." He offered no explanation as to how his mental health conditions contextualized any specific prior conviction, his criminal history as a whole, or his risk of recidivism, nor, as discussed above, did he argue as much at the sentencing hearing.

become a "raging drug abuser," which resulted in the pending case. The district court addressed Bailey's drug abuse during its sentencing explanation, acknowledging that it was something that Bailey was "going to have to work on [for] the rest of [his] life," but was not an excuse for his poor record. The court did not err in declining to give Bailey's drug use the weight he hoped in evaluating his criminal history. See United States v. Colcord, 90 F.4th 25, 32 (1st Cir. 2024) ("While [the defendant] surely would want the district court to give greater weight to his personal mitigating circumstances, the district court was entirely within its discretion to find that these mitigating factors were outweighed by the seriousness of the offense, [the defendant's] criminal history, and the need to protect the public." (citing Gall v. United States, 552 U.S. 38, 52 (2007))).

Bailey also criticizes the district court for not providing a sufficiently comprehensive explanation for the extent of the upward departure. Specifically, he says that the court failed to follow U.S.S.G. § 4A1.3(a)(4)(A), which requires the court to identify the criminal history category that "most closely resembles that of the defendant's."

The government sought a departure to criminal history category V. The district court indicated that it was not going to depart "as far as the government" requested and then imposed an eighty-seven-month sentence, which is the high-end sentence for an

offense level of 23 (Bailey's offense level) and a criminal history category of IV. We think it is sufficiently clear for purposes of plain error review that the court sentenced Bailey pursuant to a criminal history category IV, since that category is one level below the government's request and contains the precise sentence imposed.

Moreover, Bailey has not shown that the district court would impose a lower sentence if the case were remanded. The court explained that its eighty-seven-month sentence was based on the need to protect the public and promote specific and general deterrence, which would be sufficient reasons for imposing an upward variance under 18 U.S.C. § 3553(a) (instead of an upward departure under U.S.S.G. § 4A1.3) based on Bailey's poor criminal history. See United States v. Aponte-Vellón, 754 F.3d 89, 93 (1st Cir. 2014) ("[A]ny error in a departure is harmless where the district court would have imposed the same sentence as a variance. . . ."); see also United States v. Laboy-Nadal, 992 F.3d 41, 44 (1st Cir. 2021) (concluding that procedural error under § 4A1.3 was harmless where "court would have arrived at the same sentence had it done so under the name of a variance").[7]

_____

[7] Bailey also alleges that the brief written statement of reasons for the departure provided by the district court after sentencing lacks the level of detail required by U.S.S.G. § 4A1.3(c)(1). The court, however, provided a thorough oral statement of reasons for the departure, and we think it clear that the court would have imposed the same sentence had it provided a

- 33 -

Bailey further contends that the case should be remanded for resentencing because the district court mentioned that the presentence report identified forty other arrests in addition to thirty-eight prior convictions. See U.S.S.G. § 4A1.3, ("A prior arrest record itself shall not be considered for purposes of an upward departure under this policy statement."). We disagree.

A district court errs when it "relies on an arrest report, without some greater indicia of reliability that the conduct underlying the arrest took place" and when it "equate[s] arrest with guilt." United States v. Marrero-Pérez, 914 F.3d 20, 23-24 (1st Cir. 2019). However, while arrests cannot be considered as aggravating sentencing factors, "sentencing courts are not prohibited from simply recounting a defendant's arrest history . . . ." United States v. Diaz-Serrano, 77 F.4th 41, 47 (1st Cir. 2023) (quoting United States v. Santa-Soler, 985 F.3d 93, 96 (1st Cir. 2021)).

The government concedes that the district court should have refrained from mentioning Bailey's arrest record when discussing the U.S.S.G. § 4A1.3 departure. Nevertheless, unlike in Marrero-Pérez, the court did not "equate [Bailey's] arrest[s] with guilt." 914 F.3d at 23. Furthermore, it is apparent that

more robust written statement. See Fletcher, 56 F.4th at 190. Thus, any procedural error resulting from this claimed technical deficiency is harmless. See id.

- 34 -

Bailey's convictions, not his arrest record, motivated the decision to depart. The court's reference to Bailey's arrest record was provided during a summary of the presentence report section describing his criminal history. See United States v. Miranda-Díaz, 942 F.3d 33, 41 (1st Cir. 2019) ("[N]othing in our precedents forbids a sentencing court's mere mention of the undisputed facts surrounding a dismissed charge as part of a broader assessment of the defendant's troubling trajectory regarding his serial encounters with the criminal justice system."). The court relied primarily on a long list of convictions to support its conclusion that Bailey had a "horrific record." Because the court did not base its departure decision on the defendant's arrest record, any error in mentioning his arrests did not affect his substantial rights. See id. at 49.

Bailey's final procedural claims pertain to the district court's alleged misapprehension of facts in fashioning Bailey's sentence. He contends first that the court misunderstood the number of women who had obtained restraining orders against him. To support this argument, he points to the transcription of the government's sentencing argument, which includes a line stating that "from 2004 to 2021, about 20 multiple women have received a restraining order against the defendant."[8] Bailey, citing the

---

[8] The government notes that this may have been a transcription error, as there are other similar errors in the

presentence report, says that, in truth, only four women have secured restraining orders against him. But the district court never mentioned twenty women; it merely said that "multiple women ha[d] obtained restraining orders against [him]," which is an accurate statement. If Bailey believed that the court was under a misimpression when it referred to "multiple women," it was incumbent on him to say so.

Second, Bailey highlights the district court's statement that its duty in sentencing him required thinking "not only about [Bailey]" but also "the victims of [Bailey's] crime" and "the necessity to deter anybody else from doing crimes of a similar nature." Bailey argues this was a clear error because "[t]here was no victim in this offense." But the court's statement was a prefatory remark to the subsequent sentencing explanation that focused on the "seriousness of [Bailey's] criminal history," "the likelihood of recidivism," and the need for public protection and deterrence. There is no reason to believe that this isolated reference to "victims" affected the sentencing decision.

## II. Substantive Reasonableness

Finally, we reach Bailey's substantive reasonableness challenge, which we review for an abuse of discretion. A sentence is substantively reasonable so long as there is "a plausible

---

sentencing hearing transcript. We take no view of this explanation, as our conclusion is based on other reasoning.

sentencing rationale and a defensible result." United States v. Morales-Veléz, 100 F.4th 334, 346 (1st Cir. 2024) (quoting United States v. Rodríguez-Cruz, 997 F.3d 362, 366 (1st Cir. 2021)).

The district court thoroughly explained that Bailey's criminal history score did not accurately capture the seriousness of his criminal history and his likelihood of recidivism. Given his persistent criminality and that the present case involved an assault rifle, the court acted within reason when it determined that the nature of the offense, public protection, and deterrence warranted an above-guideline sentence of eighty-seven months. To be sure, Bailey suffers from addiction and mental health conditions, but those factors do not undermine the reasonableness of the district court's assessment that he had a "horrific record" worthy of additional punishment. Nor do they exclude the sentence imposed from the "universe of reasonable sentencing outcomes." United States v. Clogston, 662 F.3d 588, 593 (1st Cir. 2011) (citing United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008)).

**CONCLUSION**

Bailey's appellate counsel ably scoured the record for potential errors. But none of the alleged errors warrant relief. Bailey is a repeat offender who was trafficking in dangerous firearms. An eighty-seven-month sentence is a reasonable outcome resulting from a fair proceeding. We **affirm** the judgment.